577 So.2d 474 (1990)
William Ernest KUENZEL
v.
STATE.
7 Div. 140.
Court of Criminal Appeals of Alabama.
June 29, 1990.
Rehearing Denied August 24, 1990.
*481 James E. Malone, Talladega, for appellant.
Don Siegelman, Atty. Gen., and William D. Little and P. David Bjurberg, Asst. Attys. Gen., for appellee.
BOWEN, Judge.
William Ernest Kuenzel was indicted and convicted for the capital robbery-murder of Linda Jean Offord under Ala.Code 1975, ง 13A-5-40(a)(2). The trial judge accepted the unanimous recommendation of the jury and sentenced the defendant to death by electrocution. The trial and sentencing procedures were in accord with the applicable sections of Alabama's 1981 Death Penalty Act found in Ala.Code 1975, ง 13A-5-39 et seq. The defendant raises 27 major issues on this appeal from his conviction and sentence.
At the beginning of this opinion we must note that most of the arguments raised on appeal were not advanced in the trial court.
"However, since this is a death case, we must review the [alleged] error before us to see if it constitutes plain error and, thus, should be noticed despite the lack of a proper objection by defense counsel. Rule 45A, A.R.A.P. In considering *482 what constitutes `plain error' in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what is `plain error.' See Ex parte Harrell, 470 So.2d 1309 (Ala.1985); Ex parte Womack, 435 So.2d 766 (Ala. 1983).
"In United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court stated that the plain error doctrine should be used to correct only `particularly egregious errors' ... which are those errors that `seriously affect the fairness, integrity or public reputation of judicial proceedings'.... The plain error rule should be applied `solely in those circumstances in which a miscarriage of justice would otherwise result.' Young, supra, 105 S.Ct., at 1047....
"Furthermore, the court noted that the plain error doctrine requires that the `claimed error not only seriously affects "substantial rights" [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice.' Young, supra, 105 S.Ct., at 1047, n. 14."
Hooks v. State, 534 So.2d 329, 351-52 (Ala. Cr.App.1987), affirmed, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). See also Ex parte Hinton, 548 So.2d 562, 568 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Murry v. State, 562 So.2d 1348 (Ala.Cr.App.1988). Our examination of the record in this case reveals no plain error.

I.
The defendant argues that his constitutional rights to a fair trial and a reliable determination of punishment were violated when the chief jailer for the Talladega County Sheriff's Office served as foreman of the grand jury which returned the indictment against him. This issue is not supported by the record before this court. This allegation is raised for the first time on appeal.
The indictment was signed by James Truss as foreman of the grand jury. However, Truss is not further identified in the record. In fact, the record does not contain even the allegation that Truss was employed by the sheriff's office. Without any evidence in the record on appeal to support the allegation of error, this court cannot consider the alleged error even under the "plain error" doctrine of Rule 45A, A.R.A.P. "The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred." Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
"Even though ... this Court [is] required to search the record for plain error in every case in which the death sentence has been imposed and to take the appropriate action when such error is found,... this Court will [not] presume that reversible error occurred at trial when there is nothing in the record to so indicate,...."
Ex parte Godbolt, 546 So.2d 991, 998 (Ala. 1987).
Furthermore, even assuming that Truss was employed by the sheriff's office, the mere fact that he was the foreman of the grand jury which indicted the defendant does not automatically render him incompetent under Ala.Code 1975, ง 12-16-207(a) or ง 12-16-209. See Cardwell v. State, 544 So.2d 987, 991-92 (Ala. Cr.App.1989) (wife of assistant district attorney, who was also part-time employee of district attorney's office, was competent to serve as member of grand jury although assistant district attorney was present at grand jury proceedings, where assistant district attorney did not participate in presentation of cases and there was no discussion between assistant district attorney and wife regarding any case pending before the grand jury); Eddings v. State, 443 So.2d 1308, 1309-10 (Ala.Cr.App.1983) (district attorney's law partner, who possessed no disqualifying *483 knowledge, was competent to serve as foreman of the grand jury).

II.
The defendant argues that error was committed in the denial of a preliminary hearing. Contrary to the defendant's argument, the record supports the finding that at the time this case was set for preliminary hearing, the defendant appeared with retained counsel and waived the hearing. After the indictment had been returned, the defendant, who was represented by different counsel, made a second request for a preliminary hearing. The trial judge denied that motion, finding that the defendant had waived the preliminary hearing and "[t]hat the present request for a preliminary hearing came after an indictment and was not timely filed."
"A defendant in Alabama does not have an absolute right to a preliminary hearing." Ex parte Potts, 426 So.2d 896, 899 (Ala.1983). "Once an accused has been indicted, no grounds for reversible error exist when the accused's demand for a preliminary hearing is not satisfied." Id. "`Constitutionally, a preliminary hearing is not necessary to satisfy the requisites of due process.' ... [W]here an indictment is returned prior to the hearing, the accused is no longer entitled to the preliminary hearing." Herriman v. State, 504 So.2d 353, 357 (Ala.Cr.App.1987).

III.
The defendant's motion for a change of venue due to pretrial publicity was properly denied. During voir dire examination of the jury venire, 30 of the 64 veniremembers admitted that they had either heard or read something about the case. However, only one member of the venire maintained that he would be influenced by that prior knowledge, and he was excused for cause. The other 29 veniremembers indicated that their knowledge of the case would not influence their verdict.
In denying the motion for change of venue, the trial judge stated, "Well, the jury was questioned on that [pretrial publicity] to a great extent, and there was nobody that said they couldn't put it out of their minds. Except maybe that Lamberth fellow, and I have already granted [the defendant's] challenge."
There were only eight newspaper articles to support the defendant's claim of prejudicial publicity. Those articles are dated November 11, 1987; November 17, 1987; January 6, 1988; August 12, 1988; and August 13, 1988. No specific dates were given for the three remaining articles. The trial began on September 19, 1988. Although additional newspaper articles were published after the qualification of the venire had begun, upon questioning by the trial judge, there was no indication that any veniremember had seen or heard about those articles. There was evidence that at least some of the articles which were published at a date closer to the defendant's trial were deliberately solicited or invited by either the defendant himself or members of his family.
The defendant has failed to satisfy the test set out in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), because he has not proved that "there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity." "Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue." Id. "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved." Id. "The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).
"To ensure that the defendant has a fair and impartial jury, it is not necessary that the veniremembers be totally ignorant of the facts surrounding the case. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). `It is sufficient if the juror can lay aside his impression or opinion and *484 render a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)."
Ex parte Whisenhant, 555 So.2d 235, 238 (Ala.1989). Nothing in the record shows that any adverse publicity prejudiced the veniremembers against the defendant. The defendant has failed to show that the news coverage was so extensive as to be presumptively prejudicial and he has failed to demonstrate "actual prejudice in the entire venire." Bundy v. Dugger, 850 F.2d 1402, 1425 (11th Cir.1988), cert. denied, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989). Therefore, the judgment of the trial judge denying the motion for change of venue is due to be upheld.

IV.
The trial judge acted well within his discretion in denying the defendant's motion for individual and separate voir dire of each veniremember.
The venire was examined in three separate groups composed of 21, 21, and 22 members. The entire second group of 21 was struck by the trial judge on motion of defense counsel and with the agreement of the district attorney. The basis for the challenge of the second panel is found in the following excerpt from the record of the voir dire proceedings.
"[District Attorney:] Is there anybody that has any problem with [the defendant] being presumed innocent? Do you?
"Juror Lamberth: From what I have heard."
As we stated in Part III, veniremember Lamberth was the only member of the venire who indicated that the pretrial publicity would prejudice his or her verdict.
In Brown v. State, 571 So.2d 345, 349 (Ala.Cr.App.1990), this Court thoroughly examined this issue and recognized that the general rule is that "the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court." However, this Court held that where the defendant demonstrates that the nature of the pretrial publicity raises a significant possibility of prejudice, and a veniremember acknowledges some exposure to that publicity, due process may require individual examination of each veniremember who has been exposed to the pretrial publicity about the extent of their knowledge of the case and may require an independent determination by the trial judge with regard to each veniremember as to whether the member's knowledge had destroyed his or her ability to be fair and impartial. Id. at 352.
Unlike the situation in Brown, in this case defense counsel had the opportunity to, and did in fact, question the venire. Furthermore, defense counsel did not request the trial judge to examine the venire on any matter. Here, there is no indication that the voir dire examination of the jury venire was inadequate or that there was extensive and prejudicial pretrial publicity which would require the individual voir dire examination of each veniremember. See Brown, 571 So.2d at 352; Bell v. State, 475 So.2d 601, 607 (Ala.Cr.App.1984), affirmed, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Raines v. State, 429 So.2d 1104, 1108 (Ala.Cr.App.), affirmed, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983); Whisenhant v. State, 482 So.2d 1225, 1232 (Ala.Cr.App.1982), affirmed in part and reversed in part on other grounds, 482 So.2d 1241 (Ala.1983).

V.
The defendant argues that the trial court committed error in failing to ask the venire whether any member so favored the death penalty that they would never vote for life imprisonment without the possibility of parole.
A prospective juror may not be excluded from a capital case for personal opposition to the death penalty unless the juror's beliefs would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (footnote omitted). On the other *485 hand, "[a] venire member who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). Accord, Bracewell v. State, 506 So.2d 354, 358 (Ala. Cr.App.1986).
In this case, defense counsel never requested the trial judge to determine whether any veniremember had a bias in favor of the death penalty. We agree that the better practice is that where the death penalty is a possibility, the trial judge should examine the prospective jurors to ascertain whether any of them would clearly vote either for or against the death penalty regardless of the evidence. United States v. Van Scoy, 654 F.2d 257, 262 (3rd Cir.), cert. denied, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981). See Bracewell, 506 So.2d at 358 ("Upon proper request, a jury venire in a capital case should be questioned as to whether or not any venireperson has a fixed opinion in favor of capital punishment."). However, in the absence of a specific request that the venire be examined on this matter, we find that the trial court's failure to voir dire the venire to determine if any member favors the death penalty does not constitute plain error. See Bracewell, 506 So.2d at 358 ("[T]he failure to voir dire the venire to determine if any person favored capital punishment was not error where the jury unanimously recommended a sentence of life without parole.").
In this case, the trial judge permitted the attorneys to directly conduct most of the voir dire examination. With regard to the issue under review, defense counsel asked the first panel, "In the event that you found the defendant guilty of capital murder, is there any of you that feel that the only verdict you could return in the sentencing stage would be death by electrocution?" Defense counsel also made a similar inquiry of the second panel. However, neither of the defendant's two defense counsel made such an inquiry of the third venire panel. Our review shows that no veniremember was challenged by either side based upon an attitude or bias for or against the death penalty. Under these circumstances, we find that the failure of the trial judge to examine the veniremembers concerning whether any member would automatically vote for the death penalty upon the return of a guilty verdict does not constitute plain error. Cf. Turner v. Murray, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 1688-89, 90 L.Ed.2d 27 (1986) ("We hold that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias.... [A] defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry.").

VI.
The defendant argues that the prosecutor used his peremptory challenges to strike veniremembers in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Both the defendant and the victim are white. This issue is presented for the first time on appeal. Defense counsel made no objection to any of the prosecutor's peremptory strikes at trial, nor was this issue raised in the motion for new trial.
Even assuming that this white defendant has standing to raise a Batson-type objection, see Holland v. Illinois, 493 U.S. 474, ___, 110 S.Ct. 803, 813-14, 107 L.Ed.2d 905 (1990) (Marshall, J., dissenting), that standing does not dispense with the requirement that he establish a prima facie case of purposeful discrimination in the selection of the petit jury based solely on evidence concerning the prosecutor's exercise of peremptory challenges at trial. Batson, 476 U.S. at 96, 106 S.Ct. at 1723. See also Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987). Our examination of the jury venire list contained in the record reveals, as best this Court can determine, that there were 11 black veniremembers on the 43-member panel, that the state used six of its 15 strikes against blacks, and that two blacks *486 remained on the jury. This, in and of itself and within the context of this case, is not sufficient to show that a prima facie case of purposeful discrimination could be established. "The defendant may not prove his prima facie case solely from the fact that the prosecutor struck one or more blacks from his jury." Harrell v. State, 555 So.2d 263, 268 (Ala.1989). In Ex parte Watkins, 509 So.2d 1074, 1076-77 (Ala.1987), the Alabama Supreme Court observed:
"[W]e have carefully reviewed the record in this respect and we cannot find any plain error. Although the record does show that the defendant is black and the victim was white, it does not show that the state exercised any of its peremptory challenges to remove prospective black jurors from the venire. The record as a whole simply does not raise an inference that the state was engaged in the practice of purposeful discrimination. Under the plain error rule this Court will `notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.' (Emphasis added.) Rule 39(k), [A.R.A.P.]. The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks). In both [Ex parte] Jackson [516 So.2d 768 (Ala.1986)], and [Ex parte] Godbolt [546 So.2d 991 (Ala. 1987),] the records were sufficient to show that prima facie cases of purposeful discrimination could be made by the defendants; therefore, those cases were remanded for determination on the issue under the guidelines set out in Batson."
In both Jackson, 516 So.2d at 773 (Maddox, J., concurring specially), and Godbolt, 546 So.2d at 998-99, the issue of the systematic exclusion of blacks based on racial grounds was raised in the trial court. Here the issue was never raised before the trial court in any manner. On the record before this Court, we find no merit to the defendant's argument.
Nor can the defendant prevail on his claim that he was denied his Sixth Amendment right to trial by an impartial jury: "We reject petitioner's fundamental thesis that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives the defendant of a Sixth Amendment right to the `fair possibility' of a representative jury." Holland v. Illinois, 493 U.S. at___, 110 S.Ct. at 806.

VII.
The defendant argues that Ala.Code 1975, ง 13A-5-40(a)(2) and ง 13A-5-49(4), were unconstitutionally applied.
In Part XIX, this Court discusses the reasons why we find the evidence sufficient to sustain the defendant's conviction under ง 13A-5-40(a)(2), which defines the capital offense of robbery-murder. Therefore, we reject the defendant's allegation that this section was improperly and unconstitutionally applied because the evidence did not support the charged offense.
In addition, we find that ง 13A-5-49(4) was constitutionally applied. Section 13A-5-49(4) includes as an aggravating circumstance the fact that "the capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, ... robbery."
Initially, we find that the existence of this aggravating circumstance is supported by the evidence in this case. Second, we find that the prosecutor's comments and the trial judge's instructions regarding this aggravating circumstance were proper and not ground for error.
The defendant was indicted and convicted of the capital offense defined in ง 13A-5-40(a)(2): "Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant."
*487 In his opening statement at the sentencing hearing, the district attorney stated:
"I think the Judge will further tell you that anything that is proved by your verdict is also proved beyond a reasonable doubt and to a moral certainty in this. By the verdict of capital murder, being the robbery or the attempt to commit a robbery, that the verdict automatically proves one of the aggravating circumstances."
In his closing argument, the district attorney stated that the aggravating circumstance found in ง 13A-5-49(4) had "already [been] prove[n] ... as a matter of law, because you found him guilty of the capital offense of murder during the commission of a robbery, or either an attempt thereof."
In his oral instructions to the jury, the trial judge read the jury the aggravating circumstance found in ง 13A-5-49(4) and then stated:
"Now, Section 13A-5-45(e) provides:
Any aggravating circumstances which the verdict convicting the Defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proved beyond a reasonable doubt for the purposes of the sentence hearing."
The defendant argues that these comments and instructions impermissibly shifted the burden of proof to the defendant to show why he should not be sentenced to death. We find that these comments and instructions were proper.
Alabama Code 1975, ง 13A-5-45(e), provides:
"At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
Furthermore, ง 13A-5-50 provides:
"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.
"By way of illustration and not limitation, the aggravating circumstance specified in section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of section 13A-5-40."
This "overlap" is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 552-55, 98 L.Ed.2d 568 (1988) ("[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm."). "Cases in the Eleventh Circuit ... clearly h[o]ld the `overlap' claim does not rise to a constitutional level." Ritter v. Thigpen, 828 F.2d 662, 665 (11th Cir.1987). See also Berry v. Phelps, 819 F.2d 511, 516 (5th Cir.1987). "A defendant does not arrive at the penalty phase of a capital proceeding with a clean slate, and there is no point in pretending otherwise." Green v. Zant, 738 F.2d 1529, 1542 (11th Cir.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984). See also Ex parte Grayson, 479 So.2d at 81; Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985); Ex parte Kyzer, 399 So.2d 330, 337-38 (Ala. 1981); Ex parte Julius, 455 So.2d 984, 986 (Ala.1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985).
"To pass constitutional muster, a capital sentencing scheme must `genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)....
"....
"The use of `aggravating circumstances,' is not an end in itself, but a *488 means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase."
Lowenfield, 484 U.S. at 244, 108 S.Ct. at 554. On this basis, we reject the defendant's argument that the jury was deprived of its proper sentencing role.
The use of ง 13A-5-49(4) as an aggravating circumstance to be considered in determining punishment for a conviction under ง 13A-5-40(a)(2) does not punish a defendant twice for the same offense. Kennedy, 472 So.2d at 1108; Kyzer, 399 So.2d at 337. Defendant's claim that it does is without merit. Bundy v. Dugger, 850 F.2d at 1423; Bundy v. State, 471 So.2d 9, 22 (Fla.1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986). "We also find no merit in [the defendant's] claim that the use of the prior conviction as an element of the statutory capital offense and its use in sentencing constituted double jeopardy." Hubbard v. State, 500 So.2d 1204, 1215 (Ala.Cr.App.), affirmed, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987). "This practice does not result in double punishment for the same offense.... A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy." Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App. 1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, ___ U.S.___, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).

VIII.
This Court rejects the defendant's argument that he was denied a fair trial and sentencing determination because of the alleged flagrant misconduct of the prosecutor. We have examined each instance of alleged prosecutorial misconduct within the context of the entire trial. That review convinces this Court that this case was prosecuted in a very skillful and professional manner. It appears that the district attorney sought not only a conviction, but one which could be affirmed on appeal.

A.
The district attorney did not overstep his role as prosecutor by stating to the jury facts that were solely within his personal knowledge or by otherwise "testifying" as a witness. The defendant cites three instances of alleged improper conduct under this category.
1. During the guilt phase of the trial, the following occurred while the district attorney was questioning District Attorney's Investigator Dennis Surrett about items seized from the defendant's residence:
"Q. And then were they turned, were they turned over to someone?
"A. Yes, sir, they were.
"Q. And who was that, please sir?
"A. Yourself.
"Q. Actually it was to me and my son, was it not?
"A. That's correct.
"....
"Q. And then did you remove these items from 42 [a large envelope containing exhibits 102, 103, and 104] and have they been under you care, custody, and control since that time, and I'm talking about the contents of 102 [an envelope in which the notebook was sealed], 103 [another envelope containing various items], and 104 [another envelope containing various items]?
"A. Yes, sir, they have been.
"Q. Okay, of course, 32 [a note pad seized from Kuenzel's residence] was in the contents, was it not?
"A. That's correct.
"Q. It [the notebook] was actually in 102, I believe.
"A. Yes, sir."
Defense counsel made no objection to any of these remarks at trial.
2. At the sentencing hearing held before the jury, the following occured during *489 the district attorney's cross-examination of the defendant's mother, Mrs. Barbara Kuenzel:
"A. Just a minute. I'm talking to the Judge. And then he [the defendant] went up thereโandโhe toldโwhat he knewโand they [police] beat him because he wouldn't confess to the murder. He was black and blue the night they locked him up.
"Q. Mrs. Kuenzel, did you know there were three FBI agents and three DEA agents down there that night working on a case we were going to start the next morning when this alleged beating took place?
"A. I know they wouldn't let me see him. They told me he was not back there."
There was no objection to any of these comments at trial.
Even if we consider the district attorney's questions improper as assuming facts not in evidence, Crosslin v. State, 489 So.2d 680, 684 (Ala.Cr.App.1986), we find his comments to be totally innocuous. Even when viewed in their worst light, they did not prejudice or harm the defendant.
To constitute reversible error, "[t]he statement of counsel must be made as of fact unsupported by evidence, and `must be pertinent to the issue, or its natural tendency must be to influence the finding of the jury.'" Anderson v. State, 209 Ala. 36, 43, 95 So. 171, 179 (1922). "In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.... Prosecutorial statements which are merely trivial and nonprejudicial are not grounds for error." Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985).
3. The defendant also complains that the district attorney injected his own personal knowledge into the case by his extensive leading of numerous witnesses both at trial and at the hearing on the motion for new trial. The defendant cites 20 instances where this allegedly occurred. Of these 20 instances, objection was interposed only once during the guilt phase of the trial, which consumes 829 pages of transcript, and only twice during the hearing on the motion for new trial, which involves 155 pages of transcript.
"While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." Ex parte Kennedy, 472 So.2d at 1111 (emphasis in original). "This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See also Biddie v. State, 516 So.2d 837, 843 (Ala.Cr.App.1986), reversed on other grounds, 516 So.2d 846 (Ala.1987).
We have examined each instance of alleged prosecutorial misconduct. We disagree with the interpretation the defendant has given to most of the prosecutor's comments. While the district attorney did, on several occasions, lead the witnesses, "[w]hether to allow or disallow a leading question is within the discretion of the trial court and except for a flagrant violation there will not be reversible error." Bradford v. Stanley, 355 So.2d 328, 331 (Ala. 1978). See C. Gamble, McElroy's Alabama Evidence ง 121.05 (3d ed. 1977). Viewing the prosecutor's comments individually and cumulatively, we find no prejudice to the defendant and no cause for reversal.

B.
The defendant argues that the prosecutor's comments at the guilt phase of the trial were improper.
*490 1. The defendant argues that in his opening comments the district attorney mischaracterized capital murder by defining it as "murder plus an aggravating circumstance." There was no objection to this comment. This comment was not a mischaracterization of Alabama's death penalty scheme. See ง 13A-5-40.
2. The defendant argues that in closing argument the prosecutor told the jury it could "infer the intent" from the natural and probable consequences of the act. There were no objections to these comments at trial. The defendant has severely mischaracterized the prosecutor's comments in this regard. Contrary to the defendant's allegations on appeal, the prosecutor did not make the argument that the law presumes that a person intends the natural and ordinary consequences of his acts which was condemned in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
3. The defendant maintains that in his closing argument, the assistant district attorney attempted to elevate the indictment to an improper stature and persuade the jury to give it some weight in deciding their verdict. There was no objection raised at trial. While the prosecutor did explain the indictment to the jury, he prefaced his remarks by stating that the indictment "is not evidence in the case." We find no impropriety in his comments. In opening statement, the prosecutor may read and explain the indictment to the jury. "The indictment is the compass and North Star of any criminal prosecution. The State must navigate its case according to the indictment or risk venturing into the waters of prejudical and reversible error". Hatton v. State, 359 So.2d 822, 831 (Ala.Cr. App.1977), cert. denied, 359 So.2d 832 (Ala. 1978).
4. The defendant alleges that the prosecutor confused the jury about lesser included offenses and left them with the impression that the killing would have to have been negligent in order to find the defendant guilty of a lesser included offense. There was no objection to this matter at trial. We find no reasonable factual basis for this argument on appeal.
5. We find no impropriety in the prosecutor's comment that "if you find that someone has false lied [sic] about a material issue, ... such as an alibi issue, then that is a circumstance you can hold against the defendant, because that is the defendant's witness.... And I submit to you that his alibi witness just does not hold water." There was no objection to this statement at trial. "When a witness has willfully sworn falsely and is, therefore, shown to be unworthy of belief, the jury is entitled to disregard his entire testimony and may be so charged." Stockard v. State, 391 So.2d 1060, 1064 (Ala.1980).
6. We find no merit to the defendant's contention that the assistant district attorney misstated the law in an effort to minimize the jury's responsibilities by commenting that the jury did not have to find that anything was taken during the robbery in order to find the defendant guilty of the capital offense charged and that it did not matter who actually owned the property. There was no objection to this issue at trial. "[O]ur present robbery statutes do not require an actual taking of property." Tarver v. State, 500 So.2d 1232, 1248 (Ala.Cr.App.), affirmed, 500 So.2d 1256 (Ala.1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). "For purposes of robbery, the `owner' is the person in possession of the property.... Further, it is not necessary that the property taken be that of the person from whom it is taken." Williams v. State, 546 So.2d 705, 708 (Ala.Cr.App. 1989).
7. There was no objection to the closing argument of the district attorney that "it is really immaterial who is the trigger man and who is the wheel man." The driver of a getaway car may not be convicted of a capital offense where he did not "himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982). "[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, *491 the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony." Ex parte Raines, 429 So.2d 1111, 1112 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). Our review shows that the prosecutor was merely arguing these legal principles to the jury.
8. There was no objection to the district attorney's reply to the argument of defense counsel in which reply the district attorney stated, "[I]nconsistencies [in the testimony of a witness] are a jewel, because if there is not some inconsistencies, there is something wrong." "The credibility of a witness is a legitimate subject of criticism and discussion." Flint v. State, 370 So.2d 332, 335 (Ala.Cr.App.1979).
9. In his closing argument, the district attorney stated, "A lot of people say that I frown too much. I look too miserable, and, quite frankly, in the eleven years that I have been in this job, day after day, week after week, and month after month, there is not anything funny once you come inside this rail." This comment was made without objection. While a prosecutor should avoid comment on matters not supported by the evidence, Ex parte Stubbs, 522 So.2d 322, 323 (Ala.1987) (adopting the dissenting opinion of Patterson, J., in Stubbs v. State, 522 So.2d 317, 322 (Ala.Cr.App.1987)), we do not interpret the comment in this case as an effort to "cajole [the jury] into reaching a verdict based on the credibility or importance of the state's representative." Appellant's brief at 26.
10. Defense counsel did make a general objection to the following comment made by the district attorney in closing argument: "But, if Harvey Venn, is this low-life, this scum of the earth that they [the defense] want to make him, this 18 year old, that ain't never been convicted of a felony. Because, if he had, don't you know they would have asked him about it." The trial judge did not rule on this objection and no request for a ruling was made. This comment was in response to the prior argument of defense counsel that Venn was "nothing but a low-life animal ... because... he has admitted, at least partially, to being involved in this," and constituted nothing more than a reply in kind. Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala. 1984). On cross-examination of Venn at trial, he was not asked about any prior conviction, although defense counsel attempted to impeach Venn by showing that he had made a "deal" with the state to testify against the defendant and that he was also involved in the murder.
At trial, there was no direct evidence of whether or not Venn had ever been convicted of a felony. The defendant's defense was alibi, and he maintained that the real killer was Venn. We do not consider the comments directed at supporting Venn's credibility improper. Green v. State, 97 Ala. 59, 63, 12 So. 416, 417-18 (1893). Compare Pointer v. State, 37 Ala.App. 670, 672, 74 So.2d 615, 616 (1954). "A general statement by a prosecuting attorney as to why certain testimony or evidence was not produced by the defendant, or why certain facts were not disproved, is not improper." 75 Am.Jur.2d Trial ง 244 (1974). Furthermore, we do not construe the prosecutor's remark that the defense had not asked Venn about any prior criminal conviction as one implying that the defendant did not testify in his own behalf because he had a prior conviction.
11. It was not prejudicial error for the district attorney to refer to Venn as a "low-life." Defense counsel had previously employed this identical term in characterizing Venn. Rutledge, 482 So.2d at 1264. Contrary to the argument now made, the district attorney did not place the defendant's character in issue by calling Venn a low-life.
12. There was no objection to the argument of the district attorney that, "I'll submit to you that everything [defense counsel] waited to get up here in closing arguments about those statements [of Harvey Venn], is not exactly right. If it was, he would have put those statements into evidence. That he made." In his closing argument, defense counsel commented on the alleged conflicts between Venn's testimony *492 at trial and his account of the events contained in the tape-recorded statements Venn gave to law enforcement authorities. "While the State may not call attention to a defendant's failure to testify, it may point out the failure to produce other evidence which might be helpful to a defendant." Gissendaner v. State, 338 So.2d 1025, 1027 (Ala.Cr.App.) cert. denied, 338 So.2d 1028 (Ala.1976). See Green, 97 Ala. at 63, 12 So. at 417-18.
13. There was no objection to the following comment of the district attorney in closing argument: "April Harris has been a witness in this case since Day One, and she is on the subpoena list. I couldn't ask her what she told the police the initial time. They could and they didn't." This argument was made in response to the argument of defense counsel that the district attorney "in [his] opening statement, he stated to you that he did not expect for anyone to be able to identify Billy Kuenzel at the Crystal Store that night, the night of the incident. But, yet he came up with a witness that was able to put Mr. Kuenzel at the store. Her name was April Harris." Defense counsel requested the jury to reject Harris's testimony.
April Harris is listed on the "subpoena list," which is included in the record on appeal. However, there is nothing in the record to show that this list was ever introduced into evidence. Thus, the argument of the district attorney was improper because there was no evidence before the jury that Harris was on the subpoena list or that she gave any statement to the police. "It has long been the rule in Alabama that, although counsel should be given considerable latitude in drawing reasonable inferences from the evidence, they may not argue as a fact that which is not supported by the evidence." Ex parte Washington, 507 So.2d 1360, 1361 (Ala. 1986).
Under Rule 45A, A.R.A.P., in a capital case, this Court "shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant." Considering the district attorney's improper comment in the context of the trial setting and the closing arguments of both parties, we find that the improper comment does not constitute "plain error." We do not find the present error so egregious or obvious as to "seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). We note that on appeal, the defendant has relegated his argument of this specific instance of misconduct to a footnote in his 109-page brief. Appellant's brief at 27 n. 14.
14. The defendant argues that the district attorney committed error when he argued, "As Mr. Venn said that Mr. Kuenzel said, he said, `How do you feel about it?' `I'll get over it in two or three days.'" Later in his argument, the district attorney also made reference to "that man that would get over it in two or three days." Defense counsel made no objection to either of these comments.
Venn actually testified that before he and the defendant went to sleep on the night of the murder, he asked the defendant, "What did he think about it," referring to "what happened back at the Crystal," the scene of the crime. Venn testified that the defendant said, "Aw, it would be all right in two or three days," and also said "It was a shame that she had to get killed over some money that wasn't even hers to begin with." We find no impropriety in the prosecutor's comments. "Counsel in the trial of any lawsuit has the unbridled right (to be sure, the duty) to argue the reasonable inferences from the evidence most favorable to his client." Ex parte Ainsworth, 501 So.2d 1269, 1270 (Ala.1986) (footnote omitted). "[T]he rule is that counsel are allowed considerable latitude in drawing their deductions from the evidence in argument to the jury." Espey v. State, 270 Ala. 669, 674, 120 So.2d 904, 907 (1960).
*493 15. At trial, Venn testified that the defendant went inside the store and shot the victim while he waited in the car. In his closing argument, the district attorney admitted that he could not "tell you how that blood got on" Venn's pants, but gave the jury his "best judgment" which was based on circumstantial evidence. The district attorney then explained his theory of how the victim's blood got on the left thigh area of Venn's bluejeans but did not get on any clothing worn by the defendant. In his closing argument, defense counsel had argued that the blood on Venn's pants belonged to the victim and that Venn "got that blood on him when he went in there with the gun and shot that lady in cold blood. That's the only explanation." Defense counsel argued, "There is one thing they can't come back on, and that's these pants."
According to the district attorney's theory, the blood was transferred from the shotgun barrel used by the defendant to the clothing worn by Venn. Defense counsel did not object to the prosecutor's explanation but did object when the district attorney stated that "when blood comes out of a wound, it is what you call high velocity. It comes out in little spatters, not in deep runs, like that. It comes out in spatters, high velocity spatters." The trial judge did not rule on this objection, but the district attorney did not continue his explanation after objection was made. Contrary to the defendant's contention on appeal, there is no indication that the trial judge "refused" to rule on the objection.
There was no evidence of whether blood comes out of a wound in "spatters" or in "deep runs," and defense counsel's objection to this particular comment should have been sustained. However, we consider the improper comment to constitute merely harmless error. Rule 45, A.R.A.P.
Five of the seven characteristics that could be determined from the stain on Venn's jeans matched the characteristics of the victim's blood, according to state witness Larry Huys, a serologist for the Alabama Department of Forensic Sciences in Birmingham. Pathologist Dr. Joseph Embry testified that the "cause of death was the shotgun wound in her chest." Serologist Huys testified that no blood was found on the shotgun. Lawden Yates, the laboratory director of the Alabama Department of Forensic Sciences in Birmingham, testified that "back splash" is "biological fluids, and/or blood that is projected out of a wound that is produced with a firearm." He testified that back splash did not always occur. Yates also testified that the victim had been shot at a "distance range of somewhere from just a couple of inches up to several feet ... about five feet ... [m]easured from the end of the barrel to the target." The evidence indicated that the victim was shot while sitting on a stool behind the counter in the store. Venn testified that the defendant placed the shotgun on the counter. All the blood was located on the floor directly behind the counter. No blood was discovered on the counter itself. District Attorney's Investigator Dennis Surrett testified that he recovered the .16 gauge shotgun and "saw some type matter inside the barrel and ... saw some reddish brown spots or stains on the gun itself, on the exterior." Although this testimony was given outside the presence of the jury, the shotgun itself was admitted into evidence.
In view of the testimony and evidence presented before the jury, this Court does not consider the district attorney's explanation unreasonable as being beyond the bounds of legitimate argument. Although counsel has "no right to create evidence by his argument," Davis v. State, 49 Ala.App. 587, 590, 274 So.2d 360, 363 (1972), cert. denied, 290 Ala. 364, 274 So.2d 363 (1973), "counsel may draw any inference which the facts tend to support." Brothers v. State, 236 Ala. 448, 452, 183 So. 433, 436 (1938). "Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence." Arant v. State, 232 Ala. 275, 279, 167 So. 540, 543 (1936). "Counsel has a right to argue any reasonable inference from the evidence or lack of evidence ... and to draw conclusions from the evidence based on their own reasoning." Roberts v. State, *494 346 So.2d 473, 476 (Ala.Cr.App.), cert. denied, 346 So.2d 478 (Ala.1977). "Trial judges ordinarily are loath to limit inferential argument which has any connection with the evidence even though far-fetched.... So long as counsel does not travel out of his case and confines statements to reasonable inferences deducible from the evidence, he should not be controlled." Roberts, 346 So.2d at 477. "[I]t would be dangerous to accord to the presiding judge the right and power to intervene, and declare authoritatively when an inference of counsel is or is not legitimately drawn. This is for the jury to determine, if there be any testimony on which to base it." Cross v. State, 68 Ala. 476, 483 (1881).
16. At trial, the defendant's father testified that his son was home on the night of the murder. Mr. Kuenzel testified that he went to his son's residence around 10:30 that night to fix a toilet but found his son asleep and did not repair the toilet that night. The father testified that he "just decided not to wake him up" and to "come back the next day." There was no testimony as to when the repairs were made. In closing argument, the district attorney stated, "In fact, the toilet wasn't even fixed the next three or four days." This statement is not supported by the evidence. Defense counsel objected on the ground that "[t]here has been no testimony of that." The trial judge did not rule on the objection and the district attorney then stated, "I'll submit to you, there is no evidence that he ever went back the next day and fixed the toilet."
The district attorney's argument was improper because there is no evidence in the record as to when the toilet was fixed. However, when the repair was made is immaterial to the issues presented in this trial. Furthermore, the district attorney corrected his remark after defense counsel objected. The defendant's father was impeached on a far more important matter, and we consider this error harmless. Rule 45, A.R.A.P.
17. In closing argument, the district attorney stated, "That shotgun, to the exclusion of all other shotguns in the world, fired that .16 gauge brass hull that was burned and that was in that trash can. And I'll submit that to you, that shotgun was, in fact, the shotgun that killed that lady. And that spent hull was, in fact, the one." The district attorney's argument is proper and is based upon the evidence.
The State's firearm expert, Lawden Yates, testified that in his opinion, the burned brass shotgun hull "was fired from this shotgun," and that "[s]ince it was fired in this gun, it couldn't be fired in another gun." He indicated that in his opinion the burned hull was fired in the shotgun "to the exclusion of all other .16 gauge shotguns." He admitted that he could not determine whether the pellets recovered from the victim's body had been fired from the shotgun.
Although the State could not prove through expert testimony that the particular shotgun introduced into evidence was in fact the actual murder weapon, the circumstantial evidence indicated that it probably was. The argument of the district attorney was nothing more than a legitimate and reasonable inference from the evidence.
In connection with his argument concerning the improper comments of the district attorney in closing argument, the defendant contends that the trial judge "refused" to rule on his objections. Appellant's brief at 29 n. 15. We have examined each of the five instances cited by the defendant. Never did counsel request that the trial judge rule on any objection. Although the record shows no action by the trial judge, this fact does not support the contention that the judge refused to rule. It only shows that the trial judge failed to rule.

C.
The defendant argues that the "prosecution's penalty phase arguments were riddled with inaccuracies and unconstitutional, prejudicial commentary." Appellant's brief at 30.
1. The defendant contends that the prosecutor's comments that the *495 jury should not consider sympathy or mercy were improper. In his closing argument in the guilt phase of the trial, the district attorney stated that in arguing lesser included offenses defense counsel was "arguing for sympathy on behalf of the defendant," and that "sympathy is ... letting a criminal go without proper punishment." The prosecutor also stated that the defendant is guilty as charged, "[n]o lesser included. No sympathy."
In his closing argument in the penalty phase of the trial, the district attorney argued that "a plea for mercy and a plea for sympathy ... really doesn't have a place in a courtroom." The district attorney also urged the jury to "shed" their sympathies and "do what you think is just, under this evidence, and, ... free from sympathy, from what this evidence showed and what the law is. Not some plea for mercy. But what the law says." In his closing argument, the assistant district attorney also stated:
"I submit to you that what we have got in this case and what we have had in this sentencing phase is a plea for mercy and a plea for sympathy. And that really doesn't have a place in a courtroom. We are to take the law and the facts of what happened down there on that occasion. And you think about what happened down there on that occasion. What happened to Linda Offord. I submit to you, she didn't have time to plead for mercy or sympathy. Because it didn't involve that down there, then it ought not involve this here."
The trial judge did not mention mercy or sympathy in his oral charge to the jury.
Section 13A-5-46(d) provides: "After hearing the evidence and the arguments of both parties at the sentence hearing, the jury shall be instructed on its function and on the relevant law by the trial judge. The jury shall then retire to deliberate concerning the advisory verdict it is to return." The Alabama provisions for the imposition of capital punishment nowhere mention mercy.
In Buttrum v. Black, 479 U.S. 902, 107 S.Ct. 300, 93 L.Ed.2d 275 (1986), Justice Marshall wrote the following in his dissenting opinion from the majority's denial of certiorari:
"In closing argument at the sentencing phase of petitioner's trial, the prosecutor incorporated statements from an 1873 decision of the Georgia Supreme Court that appears with some regularity in contemporary capital sentencing proceedings in that state. See Eberhart v. State, 47 Ga. 598, 609-610 (1873); Ruffin v. State, 243 Ga. 95, 105, 252 S.E.2d 472, 479-480 (1979). The effect of these statements was to lead the jury to believe that mercy was not a permissible component of their sentencing determination:
"`You took an oath at the beginning of this case. You said, "I do," to "You shall well and truly try the issue formed upon this Bill of Indictment ... and a true verdict give according to the evidence. So help you God." "According to the evidence"; not according to mercy, not according to sympathy, not according to feeling sorry for a Defendant.... Mercy? I submit to you that we should have no sympathy with that sentiment that springs into action whenever a criminal is about to suffer for a crime. Society demands that the crime be punished and criminals warned. The false humanity that starts and shudders when the axe of justice is about to fall is a dangerous element for the peace of society. We have had too much of this mercy. It is not true mercy. It only looks to the criminal.... A stern, unbending, unflinching administration of justice is the surest way to prevent the commission of other heinous and horrible acts like the one committed by that Defendant. We are a society of Laws, not of sentiment.' App. to Pet. for Cert. A-4, pp. 17-18.
"On more than one occasion, the Georgia Supreme Court has condemned use of the statements employed by the prosecutor in petitioner's sentencing hearingโat least where they are attributed to a Justice of that courtโthough it has generally found their effect insufficiently prejudicial to warrant reversal of the death *496 sentences imposed. See, e.g., Ruffin, supra, at 105, 252 S.E.2d, at 479-480; Hawes v. State, 240 Ga. 327, 335-336, 240 S.E.2d 833, 840 (1977). The Court of Appeals for the Eleventh Circuit has rejected use of this same language, regardless of the spokesman, because its content does not relate to the particular circumstances of the defendant whose sentence is being determined, but rather implies that considerations of mercy can have no part in jury deliberations in capital sentencing proceedings. See, e.g., Wilson v. Kemp, 777 F.2d 621, 624, 626-628 ([11th Cir.] 1985), cert. denied, [476] U.S. [1153], 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); Drake v. Kemp, 762 F.2d 1449, 1458-1461 ([11th Cir.] 1985), cert. denied, [478] U.S. [1020], 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986). These divergent opinions from the Eleventh Circuit and the Georgia Supreme Court raise serious questions as to the constitutionally permissible scope of prosecutorial comment on the role of mercy in the jury's sentencing decision. Because we granted certiorari in California v. Brown, [479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) ], to decide a closely related issue, I dissent from the present denial of this petition."
Buttrum, 479 U.S. at 902-03, 107 S.Ct. at 301-302.
Anti-mercy comments by the prosecutor were also condemned in Buttrum v. Black, 721 F.Supp. 1268, 1317-18 (N.D.Ga.1989). In Wilson v. Kemp, 777 F.2d at 624, it was held that the position that "a sense of mercy should not dissuade one from punishing criminals to the maximum extent possible" is "diametrically opposed to the Georgia death penalty statute, which directs that `the jury shall retire to determine whether any mitigating or aggravating circumstances... exist and whether to recommend mercy for the defendant.'" Such a position is "fundamentally opposed to current death penalty jurisprudence." Drake v. Kemp, 762 F.2d at 1460, quoted in Wilson, 777 F.2d at 624.
However, in California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Supreme Court decided that "an instruction informing jurors that they `must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution." 479 U.S. at 539, 107 S.Ct. at 838 (emphasis added). In a concurring opinion, Justice O'Connor wrote:
"Because the individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence, I agree with the Court that an instruction informing the jury that they `must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution. At the same time, the jury instructionsโtaken as a wholeโmust clearly inform the jury that they are to consider any relevant mitigating evidence about a defendant's background and character, or about the circumstances of the crime."
479 U.S. at 545, 107 S.Ct. at 841. "[J]uries are to try and determine cases according to the law and the facts, and not according to their opinion as to whether public peace and good order will be promoted by a conviction." Crumpton v. State, 167 Ala. 4, 13, 52 So. 605, 608 (1910).
In Russell v. State, 38 So. 291 (Ala.1905), the Alabama Supreme Court held that a requested charge containing the following language was properly refused: "[I]f the evidence be equally balanced in the minds of the jury, [the jury] should lean to the side of mercy and acquit the defendant."
"Charge No. 5 was properly refused, as it suggested to the jury the duty of leaning to mercy. Mercy has no place in the verdict of a jury. It is the duty of the jury to find in accordance with the law and the facts, and leave mercy to the executive. The Hughes' Case, 117 Ala. 25, 23 South. 677, is not to be taken as a sanction by this court of a suggestion to *497 the jury to exercise mercy in deciding the facts of a case."
Russell, 38 So. at 297 (emphasis added).
In Avery v. State, 124 Ala. 20, 22, 27 So. 505, 506 (1900), the Court found "no error" in the trial judge's instruction to the jury that "[m]ercy does not belong to you. No question of mercy, sentiment, or anything else, resides with you, except the question as to whether or not you believe from the evidence, beyond a reasonable doubt, that the defendant is guilty." See also Roberson v. State, 183 Ala. 43, 47-48, 62 So. 837, 839 (1913) ("There was no error in that part of the court's oral charge to the jury to the effect that mercy and sentiment did not rest with them. It could have been omitted, but we cannot say that it was either improper or erroneous"); Kirby v. State, 151 Ala. 66, 69, 76, 44 So. 38, 40, 42 (1907) (requested charge that "if the evidence is evenly balanced, you should lean towards the side of mercy and decide in favor of the defendant" was "bad and was properly refused"); Hughes v. State, 117 Ala. 25, 29, 23 So. 677, 678 (1898) (same).
"We believe that this comment [of the trial judge that he could not consider the feelings of the defendant's family] reflects the court's concern that `mere sympathy' unrelated to the circumstances of the crime or to the history and character of the defendant is not a constitutionally relevant factor in determining the appropriate sentence in a capital case. The court's view is correct in light of two recent Supreme Court capital-sentencing decisions which considered the role of sympathy both as an aggravating and as a mitigating factor. [Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and California v. Brown]....

"... We therefore hold that the trial court did not err in declining to consider sympathy for the defendant's parents in imposing the death penalty upon the defendant."
People v. Erickson, 117 Ill.2d 271, 111 Ill. Dec. 924, 513 N.E.2d 367, 381 (1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988).
In Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the trial judge instructed the jury at the sentencing phase of the trial as follows:
"You must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence. You should discharge your duties as jurors impartially, conscientiously and faithfully under you oaths and return such verdict as the evidence warrants when measured by these Instructions."
494 U.S. at ___, 110 S.Ct. at 1259.
In Parks, the Supreme Court of the United States rejected the principle that the Eighth Amendment requires that jurors be allowed to base the sentencing decision upon the sympathy they feel for the defendant after hearing his mitigating evidence.
"We thus cannot say that the large majority of federal and state courts that have rejected challenges to antisympathy instructions similar to that given at Parks' trial have been unreasonable in concluding that the instructions do not violate the rule of Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ], and Eddings [v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)]....
"....
"... It is no doubt constitutionally permissible, if not constitutionally required,... for the State to insist that `the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.' California v. Brown, 479 U.S., at 545, 107 S.Ct., at 841 (O'CONNOR, J., concurring). Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary....

*498 "....
"Parks' argument relies upon a negative inference: because we concluded in Brown that it was permissible under the Constitution to prevent the jury from considering emotions not based upon the evidence, it follows that the Constitution requires that the jury be allowed to consider and give effect to emotions that are based upon mitigating evidence. For the reasons discussed above, see supra, at ___, we doubt that this inference follows from Brown or is consistent with our precedents. The same doubts are shared by the clear majority of federal and state courts that have passed upon the constitutionality of antisympathy instructions after Brown."
494 U.S. at ___, 110 S.Ct. at 1261-63. See also California v. Brown, 479 U.S. at 539, 107 S.Ct. at 838 (instruction during penalty phase of capital murder trial, that jurors must not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," did not violate Eighth or Fourteenth Amendments).
On the basis of these decisions, we find no plain error in the prosecutor's comments against mercy and sympathy. "In order to obtain relief [from an alleged misstatement of the law by a prosecutor], ... petitioner must show that: (1) the prosecutor in fact misstated the law; and (2) the misstatement rendered the trial fundamentally unfair." Harich v. Wainwright, 813 F.2d 1082, 1091 (11th Cir.1987), affirmed on rehearing, 844 F.2d 1464, 1468-69 (11th Cir. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989). Here, the defendant has shown neither.
2. At the penalty phase of the trial, the defendant's mother and his ex-wife testified in his behalf. In his closing argument, the district attorney stated, "[The defendant's wife] gets up here, and the mother gets up here and saying, spare my son, and spare my husband. What do you think about those [the victim's] people right back there. Of Linda Offord's that would like to get up here. Don't you think they would have liked to have had the chance to ask him [the defendant] to spare their daughter, their sister, their brother, or mother." The district attorney also stated: "[The victim's family] come[s] in this courtroom and ask[s] for justice just like the defendant and his family does." Defense counsel made no objection to either of these comments.
Booth v. Maryland, 482 U.S. 496, 507, 107 S.Ct. 2529, 2535, 96 L.Ed.2d 440 (1987), "reject[s] the contention that the presence or absence of emotional distress of the victim's family, or the victim's personal characteristics, are proper considerations in a capital case." See McGahee v. State, 554 So.2d 454, 470 (Ala.Cr.App.), affirmed, 554 So.2d 473 (Ala.1989) (victim's bother was improperly allowed to testify that when he learned of victim's attack he retrieved his shotgun and intended to shoot the defendant). While we do not approve of the comments of the district attorney, we do not think they rise to the level condemned in Booth. See Bertolotti v. Dugger, 883 F.2d 1503, 1524 n. 19 (11th Cir.1989) (the court "doubted" that the prosecutor's comment that the victim "is just kind of an abstract person" and "[e]verybody's forgotten about her" rose "to the level condemned by the Supreme Court in Booth," and did not consider this statement "unconstitutionally prejudicial").
We consider the remarks in this case to be similar to those referring to the loss suffered by the victim's family.
"[A] reference to the loss suffered by the victim's family `is no more than a compelling statement of the victim's death and its significance,' a matter relevant to the valid consideration of retribution in sentencing."
Johnson v. Wainwright, 778 F.2d at 630. Accord, Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir.1985), vacated on other grounds, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986).
"While argument focusing on the victim can be dangerous, not all prosecutorial references to the victim are improper. The fact that there is a victim, and facts about the victim properly developed during the course of the trial, are not so far *499 outside the realm of `circumstances of the crime' that mere mention will always be problematic. It is not necessary that the sentencing decision be made in a context in which the victim is a mere abstraction."
Brooks, 762 F.2d at 1409. Here, as in Brooks, "[t]he comments did personalize the victim, but they were brief enough that we cannot conclude that they injected prejudicial or irrelevant material into the sentencing decision." 762 F.2d at 1409.
3. The defendant contends that the state "improperly listed and discussed for the jury aggravating circumstances that had nothing to do with this case." Appellant's brief at 34. The defendant complains of the following comments made by the district attorney in his opening arguments in the penalty phase of the trial:
"Now, I think the Court will charge you at the end of this, that there are several aggravating circumstances that you are to consider."
"....
"... By the verdict of capital murder, being the robbery or the attempt to commit a robbery, that the verdict automatically proves one of the aggravating circumstances. And that is an aggravating circumstance that we will be relying upon in this hearing. I thinkโthat there are other aggravating circumstances, even though that [sic] we will find that they do not exist.... [The district attorney then enumerated the 8 aggravating circumstances set out in Ala.Code 1975, ง 13A-5-49]."
"....
"... [T]he State is required to prove at least one aggravating circumstance. And I submit to you that the Judge will charge you that we have proved [that] by the verdict of the robbery/murder or the attempted robbery/murder."
In his closing arguments to the jury during the penalty phase, the district attorney made the following comments:
"But, a verdict in this case, relative to an aggravating circumstance has already been proven beyond a reasonable doubt and to a moral certainty, as to one of the aggravating circumstances.
"And I would like to go over a few of those with you. And, relative to the aggravating circumstances, I submit to you, based upon the law and what I believe Judge Sullivan will tell you. [sic] That the defendant has committed a capital offense while he was engaged, either as an accomplice, or in the commission, or attempt to commit a robbery.
"That is what he was charged with in this case. And there are eight aggravating circumstances under the law, that you must look at, or to look at in regards to a sentence in this case.
"One of them, you have already proved it as a matter of law, because you found him guilty of the capital offense of murder during the commission of a robbery, or either an attempt thereof.
"The others are that: [the assistant district attorney then enumerated the remaining aggravating circumstances, indicating that each one did not apply except as indicated below]."
"....
"The next one would be: That he had previously been convicted of a felony involving the use of violence to a person, and the burglary, we have got a burglary and a theft [convictions to which Kuenzel admitted at the sentencing hearing], and that doesn't necessarily involved [sic] violence to a person."
We find no error in these comments. Some of them have been discussed earlier in this opinion and found proper. We find no merit to the defendant's argument that the prosecutor attempted to mislead the jury into considering improper aggravating circumstances. The district attorney specifically informed the jury that the state was relying on only one aggravating circumstance. The trial judge charged the jury on only the aggravating circumstance found in ง 13A-5-49(4) ("The capital offense was committed while the defendant was engaged ... in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, ... robbery.").
*500 With regard to the last comment quoted above, we find that the prosecutor was implying that the aggravating circumstance found in ง 13A-5-49(2) ("[t]he defendant was previously convicted of ... a felony involving the use or threat of violence to the person") would apply if the prior convictions involved violence to a person. However, the prosecution never suggested that it could prove the existence of this aggravating circumstance and the trial court did not instruct the jury on this aggravating circumstance. Consequently we find no error in the prosecutor's comments. "[I]t would be improper for a prosecutor to urge the jury to find a statutory aggravating circumstance on any basis other than the relevant facts introduced in evidence and the proper inferences therefrom." Brooks v. Kemp, 762 F.2d at 1408 (footnote omitted).
4. The assistant district attorney stated that the aggravating circumstance defined in ง 13A-5-49(5) ("[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody") "doesn't apply here. Because he wasn't in the store trying to prevent somebody from arresting him, because nobody was there to arrest him." Contrary to the defendant's argument, we do not find that this comment was "designed to inflame sentiment against appellant." Appellant's brief at 35 n. 18. The prosecutor's statement was simply one of fact, supported by the evidence.
5. The assistant district attorney made reference to "the aggravating circumstances that has already been proven." (Emphasis added.) We consider this to be either a typographical error in the record (the statement is grammatically incorrect) or simply a misstatement by the prosecutor. We do not consider this to be an attempt by the prosecution to convince the jury that there was more than one aggravating circumstance in this case.
Nor do we attach any significance to the prosecutor's statement, "If you find, under the law, that the mitigating circumstances outweigh the aggravating circumstances, then it is life without parole." We do not consider this an attempt to convince the jury of the existence of a number of aggravating circumstances. "[N]o iron-clad rule exists by which the prejudicial qualities of improper remarks or argument of counsel can be ascertained in all cases, much depending upon the issues, parties, and general circumstances of the particular case." Anderson v. State, 209 Ala. at 43, 95 So. at 178.
6. The defendant argues that the state "misled the jury about the nature and function of mitigating circumstances." Appellant's brief at 36. Defense counsel did not object to the comments of the prosecutor on this matter at trial. We reject the defendant's assertion that the prosecution "made it seem as if there were a finite list of mitigators available to Mr. Kuenzel." Appellant's brief at 37. The prosecutor stated, "The mitigating circumstances in this case, ... when you look at the statutory mitigating circumstances, and there are seven of them. That none of them apply.... But the defendant is also allowed... to introduce any other evidence that he may have, about his character, or about anything else, for you to consider, that could potentially mitigate the aggravating circumstances that has already been proven."
The prosecutor's arguments that the mitigating circumstances found in งง 13A-5-51(2) and (6) did not apply in this case did not misdescribe those mitigating circumstances or mislead the jury. The trial judge properly found that those mitigating circumstances did not exist in this case. See Clisby v. State, 456 So.2d 99, 102 (Ala. Cr.App.), after second remand, 456 So.2d 102 (Ala.Cr.App.1983), affirmed, 456 So.2d 105 (Ala.1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985). Here, as in Thompson v. State, 503 So.2d 871, 881 (Ala.Cr.App.1986), affirmed, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987), although there was evidence that the defendant had been using drugs and consuming alcohol, his voluntary intoxication did not constitute grounds for the mitigating circumstance that his capacity to appreciate *501 the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
7. The defendant argues that the prosecutor "told the jurors that under certain conditions they would have to impose death." Appellant's brief at 38. There was no objection to these comments at trial.
In his closing argument during the penalty phase of the trial, the assistant district attorney did state, "So, if you find that there is one [aggravating circumstance] and there is no mitigation to outweigh that aggravating circumstance, I think Judge Sullivan will tell you that your verdict in this case is a verdict for death." This is a proper argument. Section 13A-5-46(e)(3) states: "If the jury determines that one or more aggravating circumstances as defined in section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death."
The "shall return" language of ง 13A-5-46(e)(3) does not unconstitutionally prevent the jury's individualized assessment of the appropriateness of the death penalty. Boyde v. California, 494 U.S. 370, ___, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990).
"Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances `outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence `in an effort to achieve a more rational and equitable administration of the death penalty.'"
Boyde, 494 U.S. at ___, 110 S.Ct. at 1196. See also Blystone v. Pennsylvania, 494 U.S. 299, ___, 110 S.Ct. 1078, 1081, 108 L.Ed.2d 255 (1990), upholding the constitutionality of the Pennsylvania death penalty statute which provides that "[t]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances."
8. The defendant argues that the prosecution tried to minimize the jury's role in sentencing. This argument is based upon the following comments of the prosecutor made in closing argument at the penalty phase of the trial:
"But, if the mitigating does not outweigh the aggravating, the recommendation shall be death in this case."
"....
"I ask you, in the interest of justice, and in the name of the people of the State of Alabama, to speak the last word that will be spoken in this courtroom in behalf of Linda Offord, and find him guilty, as a recommendation to the judge. And it is a recommendation to the Judge, but it is all so very important."
Defense counsel made no objection to these arguments.
In his instructions to the jury during the penalty phase of the trial with regard to this issue, the trial judge charged:
"The purpose of this hearing is to determine the punishment. That is, to determine whether by an advisory verdict as provided in Section 13A-5-46(e) of the Code, to determine whether you recommend that he be punished by death, or whether you recommend that he be punished by life imprisonment without parole."
"....
"You can also consider in arriving at your recommendation the evidence that was presented during the guilt phase of the trial that is relevant to the existence of any aggravating or mitigating circumstances. That is, you may consider the evidence that you have heard during the trial of the case in chief in arriving at your recommendation."
"....
"In order to bring back a verdict recommending the punishment of death, if that be what you recommend, it takes at least ten of your number to vote for *502 death. In other words, the recommendation for a death sentence either has to be unanimous, or eleven to one, or it could be ten to two.
"To bring back a verdict recommending life imprisonment without parole it takes a majority vote. That means that at least seven of you would have to vote for life imprisonment without parole. It could be seven to five, or eight to four, or nine to three, or any number more than seven, but it has to be at least seven.
"The form of your verdicts will be furnished to you by the Court. Now, should you decide that you want to recommend the death sentence, the form of your verdict would read: We the jury recommend that William Ernest Kuenzel be punished by death. And over here is a place for Death, and you put a number. And over here is life imprisonment without parole, and you put a number over there. That would be a zero, or a one, or a two. It has to be at least ten to two to recommend the death sentence....
"If it is your recommendation that the Defendant be punished by imprisonment in the state penitentiary for life without parole, this would be the form of your verdict...."
Defense counsel announced "satisfied" with these instructions, and did not object to either the prosecutor's comments or the instructions of the trial judge.
"[T]he comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell [v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)]." Martin v. State, 548 So.2d at 494. See also Ex parte Hays, 518 So.2d 768, 777 (Ala.1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988). These comments and instructions do not minimize the jury's role and responsibility in sentencing.
9. The defendant argues that the prosecutors "made otherwise improper and inflammatory arguments at the penalty phase hearing." There was no objection to these comments.
(a) The prosecutor's argument that the defendant and his mother attempted to bribe Orrie Goggins into committing perjury by testifying that Goggins and not the defendant was with Venn on the night of the crime is supported by evidence presented at the penalty phase.
(b) The district attorney did refer to the defendant as a "one-eyed jack." This comment is a legitimate inference from the evidence presented by the State that the defendant was a cold-blooded murderer while the evidence by the defense at the sentencing phase presented him as a "good boy [who] couldn't hurt anyone." In our opinion, the district attorney's comment was but a mild characterization of the defendant based on the testimony before the jury and was entirely proper. Barbee v. State, 395 So.2d 1128, 1134 (Ala.Cr.App. 1981).
(c) In his closing argument, the district attorney stated:
"Now, something don't fit, ladies and gentlemen. That lady gets up here, and the mother gets up here and saying, spare my son, and spare my husband. What do you think about those people right back there. Of Linda Of ford's that would like to get up here. Don't you think they would have liked to have had the chance to ask him to spare their daughter, their sister, their brother, or mother.
"The merciless begs for mercy. If there is one person in this courtroom that believes in capital punishment, it is that man seated right over there.
"....
"I ask you to do that. This family seated right over here. They come in this courtroom and ask for justice just like the defendant and his family does. And I ask you to think about that.
"And I ask you, when you are back there to speak for the Offord family. Because, I submit this to you, the consequences *503 of the crime last a lot longer than the commission. The consequences last a lot longer than the commission. It will last every day of those people's lives. Every single day.
"I ask you to go back there and speak for that family and speak for Linda Offord. And you speak to the Billy Kuenzels of this world.
"I ask you, in the interest of justice, and in the name of the people of the State of Alabama, to speak the last word that will be spoken in this courtroom in behalf of Linda Offord, and find him guilty, as a recommendation to the judge."
Defense counsel made no objections to these comments.
At the penalty phase of the trial, the defendant's mother testified. She begged the jury to spare her son's life. The defendant's former wife, Faye Welch, requested the jury, "Don't put him on the chair." The defendant himself asked the jury to spare his life so that his son would not "have to grow up without a father completely."
In his closing argument, defense counsel argued that the defendant's ex-wife "still has strong feelings for Billy. You could see that. She said Billy was a good father to his child and she wanted her child to grow up with a father." He also argued that the defendant's mother was "visibly upset over what has happened here today." In our opinion, these comments were obvious attempts by defense counsel to elicit sympathy and mercy for the defendant. The prosecutor's comments were merely a fair and proper response to these statements and the testimony elicited at the penalty phase hearing. Ex parte Rutledge, 482 So.2d at 1264.
(d) In his closing argument, the district attorney made the following comments:
"You know, one of the greatest things, I guess, probably in America, we have always had the ability to do what is necessary in protection of this country and our way of life, and what's wrong.
"It may take us a long time to address wrongs. But, ultimately, we have always had that ability.
"And that duty and ability even goes to having the right to ask young people of this country to go out and give their lives in defense of this country. We have that right, and we do that quite often in this country.
"And if surely we have the right to ask young people to defend this country and our way of life, then we have the right to execute the worst of its criminals."
"....
"We have to do things to preserve our way of life and our heritage."
"....
"... It is society's right of self defense."
The defendant argues that these comments represent an improper attempt by the prosecutor to urge a verdict based on patriotic sentiment and a verdict that had nothing to do with the unique circumstances of this defendant and this case. We find no impropriety in these comments.
"In Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement. Embrey v. State, 283 Ala. 110, 118, 214 So.2d 567 (1968).
"This line of argument is `within the latitude allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to punish crime, but to protect the public from like offenses and as an example to deter others from committing like offenses.' Varner v. State, 418 So.2d 961 (Ala.Cr.App.1982); Cook v. State, 369 So.2d 1243 (Ala.Cr.App.1977), affirmed in part, reversed in part on other grounds, 369 So.2d 1251 (Ala.1978)....
"....
"... [T]he closing argument in the instant case did not imply that the defendant himself would commit illegal acts in the future, nor did the prosecutor seek by inflammatory appeal to arouse in the jurors a personal hostility towards, or fear of, the defendant. Accordingly, the prosecutor's comments properly argued *504 the necessity of law enforcement as a deterrent to crime and as a protection of society."
Ex parte Waldrop, 459 So.2d 959, 962 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). See also Cook v. State, 369 So.2d 1251, 1254 (Ala.1978). In our opinion, these comments do not violate the rule expressed in Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743-44, 77 L.Ed.2d 235 (1983), that "[w]hat is important at the selection stage [of the statutory aggravating circumstances] is an individualized determination on the basis of the character of the individual and the circumstances of the crime." (Emphasis in original.) The comments of the district attorney emphasized the protection of society through enforcement and application of the death penalty. The comments were directed toward a justification for the death penalty as a right of society rather than being directed at the defendant. "An argument ... urging the jurors to consider the deterrent effect of the [death] penalty, is not improper." Brooks v. Kemp, 762 F.2d at 1409 (footnote omitted). A comment that the accused is "a cancer on the body of society" goes "directly to the appropriate concern for whether [the accused] would continue to be a threat to society." Brooks, 762 F.2d at 1413.
The prosecutor's argument that "if surely we have the right to ask young people to defend this country and our way of life, then we have the right to execute the worst of its criminals" did not go beyond the bounds of legitimate argument.
"[T]he analogy of the death penalty to killing in a war was appropriate insofar as it implied that imposing death, while difficult, is at times sanctioned by the state because of compelling reasons (national security or deterring crime). While the phrase `enemy of society' was harsh, we do not seriously fault its application to one whose crime is `so grievous an affront to humanity that the only adequate response may be the penalty of death.' Gregg v. Georgia, 428 U.S. [153, 184], 96 S.Ct. [2909, 2931, 49 L.Ed.2d 859 (1976) ].
"Our acceptance of part of this argument cannot blind us to its obvious faults. The principal fault of the analogy is that a capital sentencing jury under the Georgia statutory scheme is bound to exercise broad discretion in its determination of a just punishment. This discretion is simply not analogous to the role of a soldier who is ordered to kill the enemy. Using the soldier metaphor, and coupling it with a challenge to the jurors' patriotismโ'When [the soldiers] did a good job of killing ..., we decorated them and gave them citations'; `if we can send a 17-year old young man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case against William Brooks'โmisrepresents the task the jury is charged by law to carry out. See, e.g., Viereck v. United States, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943). The main thrust of death penalty jurisprudence since Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), has been the need for guided discretion in the sentencing body's individualized consideration of the capital defendant. See, e.g., Zant v. Stephens, supra. Conceiving of the jurors as soldiers undermines the crucial discretionary element required by the Eight Amendment. Discussing the broad `criminal element' and then seeking death for Brooks because `he's a member of the criminal element' undermines the requirement that sentencing consideration be individualized by introducing the improper suggestion that Brooks be killed merely because he is a criminal. In these respects, the `war on crime' argument was improper."
Brooks, 762 F.2d at 1412-13.

D.
The defendant argues that the prosecutor improperly questioned defense witnesses by asking inflammatory questions for which there was no basis in the record.
(a) At the guilt finding phase of the trial, defense witness Hope Chamberlain testified that on the day of the murder *505 Venn and the defendant brought a "gun" to the residence of the defendant's parents and left it there. On cross-examination the following occurred:
"Q. [district attorney]: I believe you told me in the grand juryโcan you describe the gun to us?
"A. Not really.
"Q. [district attorney]: Didn't you tell me in the grand jury that it had a barrel about the sizeโ
"MR. WILLINGHAM [defense counsel]: I object to what she told him in the grand jury.
"Q. This is cross examination.
"THE COURT: This is cross examination."
On redirect examination, the witness indicated that the gun she saw was similar to the murder weapon.
"[A] witness may always be impeached by showing that he has made a contradictory statement as to material matters before the grand jury." Mullins v. State, 31 Ala.App. 571, 573, 19 So.2d 845, 847 (1944). "Great latitude is allowed on the cross-examination of a witness for the purpose of laying a predicate for proof of contradictory statements." Davis v. Clausen, 2 Ala.App. 378, 384, 57 So. 79, 81 (1911).
"When a witness, on cross-examination, denies that he made a statement out of court which is inconsistent with his testimony on direct examination, the only available move for the impeaching party is to bring on an impeaching witness who can testify as to the prior inconsistent statement of the witness being impeached. Before such extrinsic evidence may be elicited, however, it is the general rule that the impeaching party must lay a proper predicate by asking the party being impeached whether he made such statement, specifying with reasonable certainty the time when, the place where, the person to whom such supposed statement was made and the substance of such statement."
C. Gamble, McElroy's Alabama Evidence, ง 157.01(1) (3d ed. 1977). We find no impropriety in the attempt of the district attorney to show that the witness saw the defendant with a shotgun which was not the murder weapon. The record does not contain even the suggestion that the district attorney was using false information in an attempt to impeach the witness.
(b) At the hearing on the motion for new trial, the defendant's mother testified on direct examination that on the night of the murder the defendant spent at least part of the night with Lisa Peoples Sims and that Mrs. Kuenzel, through the services of a private investigator, had ascertained the identity of Ms. Sims "about a week ago."
On cross-examination, the following occurred:
"Q. [district attorney]: Do you remember testifying before the grand jury on June 2 of 1988 that Laurie Bonner spent all night with your son, Mrs. Kuenzel?
"A. I didn't say all night, I said about 9:30."
Defense counsel made no objection to this question. Later, the district attorney, on cross-examination of Mrs. Kuenzel, examined her about whether or not she remembered testifying before the grand jury that the defendant told her that a person named Cathy came over to his house on the night of the murder. Defense counsel made no objection to this testimony.
(c) The district attorney also questioned Mrs. Kuenzel about her testimony before the grand jury with regard to Orrie Goggins. Defense counsel did object to "further questions" about Goggins. However, the record simply does not support the defendant's assertions in brief that the questioning of Ms. Chamberlain or Mrs. Kuenzel about their testimony before the grand jury denied him his rights to due process and confrontation of the witnesses against him. The prosecutor's questions were proper and in no instance was defense counsel prohibited from cross-examining any witness. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), simply does not apply.
The defendant's allegations of other improper questions by the district attorney are simply without factual or legal merit.
*506 (d) The defendant also contends that the State "made improper inquiry of appellant's mental health expert at the sentencing hearing before the jury." Appellant's brief at 42. The defendant argues that the prosecutor improperly cross-examined defense witness Don Weathington by asking him questions that did not have any basis in fact and which violated the privilege between a "counselor" and the defendant.
At the penalty phase of the trial before the jury, defense witness Don Weathington testified that he was a "licensed counselor;" that he examined the defendant on August 19, 1988 (the date of the trial was September 19, 1988); and that he had no way of knowing whether the defendant was capable of intentionally committing a violent act such as that with which he was charged. On direct examination by defense counsel, he testified that the defendant told him that "during that day he had consumed a rather large quantity of alcohol and that he didn't really remember much of anything that went on...." He testified that "the possibility is there, for at some time his having a mental problem. Although I don't find any evidence of that being the case right now."
On cross-examination of Weathington, the following occurred:
"Q. [district attorney]: ... [D]id he tell you that he considered himself a capital a-s-s-h-o-l-e?
"A. No, sir."
Defense counsel did not object to this and other questions about the use of the term "capital asshole" during conversations between the defendant and Weathington.
At the penalty phase of the trial before the jury, the State called Steven Dean Cotney, who had been a co-worker of defendant's and who testified that the defendant referred to himself as a "capital asshole." Cotney testified that the defendant described himself and Venn as "capital assholes" who "won't let nobody get over on us" and who could kill somebody and get by with it. Cotney stated that the defendant said that a "modern day asshole" lets people "get over on [them]."
There was no violation of the counselor-client privilege because defense counsel had asked Weathington, the counselor, several questions about what the defendant had told him during the interview. See Free v. State, 455 So.2d 137, 141-42 (Ala. Cr.App.1984). Cf. 8 Wigmore on Evidence ง 2327 (McNaughton rev. 1961) (waiver of attorney-client privilege by calling attorney to testify as to communications between him and client). Furthermore, defense counsel failed to show that Weathington practiced as a "psychologist" as that term is defined by ง 34-26-1(a).
(e) In a footnote, Appellant's brief at p. 43 n. 20, the defendant asserts that the prosecutor misconstrued the nature of the privilege between attorney and client and the trial court improperly limited the information the defendant could elicit from his counsel and thus precluded him from appropriately litigating his new trial motion.
At the hearing on the motion for new trial, the defense called the defendant's trial counsel, Bill Willingham, as its witness and sought to question him about one part of the conversations had with the defendant. The district attorney objected and argued that "if he waives the attorney-client privilege and goes into a part of the conversation, then that whole attorney-client privilege is waived." When the trial court indicated that the privilege would be waived by continued questioning of this witness, defense counsel stated that he had no further questions. "[The defendant] could not invite such an investigation, and reap the advantages of a partial and one-sided statement from its witness of what occurred, and thereafter, object to [the prosecution's] bringing out the whole conversation." Louisville & Nashville Railroad v. Hill, 115 Ala. 334, 350, 22 So. 163, 168 (1897).

IX.
The defendant argues that the prosecutor violated the principles of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and that his trial and *507 sentencing were tainted by impermissible references by the prosecution to the suffering of the victim's family.
At the beginning of trial, the district attorney, outside the presence of the jury, asked that the victim's daughter be exempt from the rule. Under the Alabama Crime Victim's Court Attendance Act, Ala.Code 1975, ง 15-14-50 through ง 15-14-57, the victim's daughter, as the victim's representative, had a right and was "entitled" to be present in court. See also, Crowe v. State, 485 So.2d 351, 363 (Ala.Cr.App.1984); Brodka v. State, 53 Ala.App. 125, 132, 298 So.2d 55 (1974).
At the penalty phase of the trial, the district attorney made the following argument to the jury in closing:
"Now something don't fit, ladies and gentlemen. That lady gets up here, and the mother gets up here and saying, spare my son, and spare my husband. What do you think about those people right back there. Of Linda Offord's that would like to get up here. Don't you think they would have liked to have had the chance to ask him to spare their daughter, their sister, their brother, or mother.
"....
"I ask you to do that. This family seated right over here. They come in this courtroom and ask for justice just like the defendant and his family does. And I ask you to think about that.
"And I ask you, when you are back there to speak for the Offord family. Because, I submit this to you, the consequences of the crime last a lot longer than the commission....
"I ask you to go back there and speak for that family and speak for Linda Offord. And you speak to the Billy Kuenzels of this world.
"I ask you, in the interest of justice, and in the name of the people of the State of Alabama, to speak the last word that will be spoken in this courtroom in behalf of Linda Offord, and find him guilty...."
In his closing remarks to the jury at the guilt finding phase, the district attorney argued:
"Who is Linda Offord? She was a person that went to work that day at 3:00 o'clock, not knowing when she went to work, and her daughter was there for a while, that when her daughter left, it was the last time she was going to see her. Who was that person? She is not just something we refer to as a piece of evidence. She was a human being."
Defense counsel made no objection to any of the above comments.
Some of the above comments were a proper response in kind to comments and argument made by defense counsel. Ex parte Rutledge, 482 So.2d at 1264. The remaining comments were not reversible error.
"We observe that the prosecutor, during her penalty phase arguments, referred to the impact of [the victim's] death upon her parents, a subject arguably inappropriate under the recent decision in Booth v. Maryland, (1987) [482] U.S. [496], 107 S.Ct. 2529, 96 L.Ed.2d 440, barring testimony or statements from a victim's family regarding the impact upon them arising from the victim's death.
"....
"Unlike Booth, where the jury was given lengthy, detailed statements from family members regarding the actual impact of the victim's death upon their lives, here the prosecutor's remarks were confined to matters already obvious to any juror. Accordingly, the Booth decision is `patently distinguishable.' (People v. Miranda, supra, 44 Cal.3d 57, 113, 241 Cal.Rptr. 594, 744 P.2d 1127.) Moreover, these remarks did not focus on the effect on the family but instead simply distinguished defendant's treatment of his victims from the treatment they received from their loving families. Accordingly, assuming Booth would apply to prosecutorial argument of this kind, we conclude that the error was harmless beyond a reasonable doubt." *508 People v. Hovey, 44 Cal.3d 543, 244 Cal. Rptr. 121, 749 P.2d 776, 795, cert. denied, 488 U.S. 871, 109 S.Ct. 188, 102 L.Ed.2d 157 (1988).
"Counsel should be given wide latitude in arguing to the jury; and only where the defendant is prejudiced by the State's argument is reversal mandated." Bayne v. State, 375 So.2d 1237, 1238 (Ala.1978). The test, where there has been no objection, is whether the error "has or probably has adversely affected the substantial rights of the appellant." Rule 45A, A.R. A.P. Cf. Ex parte Tomlin, 540 So.2d 668, 670 (Ala.1988) (applying Rule 39(k), A.R. A.P., which contains a provision virtually identical to Rule 45A, to statements of prosecutor). "[T]he propriety of argument of counsel to the jury depends upon the particular issues, facts and atmosphere of each case." Bryson v. State, 264 Ala. 111, 114, 84 So.2d 785, 788 (1955). "There is no legal standard by which the prejudicial qualities of improper remarks of a solicitor in the trial of a case can be gauged. Each case must be determined on its own merits." Smith v. State, 282 Ala. 268, 291, 210 So.2d 826, 848 (1968). Here, we find that the argument and comments of the district attorney do not constitute reversible error. See Lewis v. State, 456 So.2d 413, 415 (Ala.Cr.App.1984); Windom v. State, 18 Ala.App. 430, 433, 93 So. 79, 82, cert. denied, 208 Ala. 701, 93 So. 924 (1922).

X.
The defendant argues that a shotgun shell and a note pad were illegally seized.

A.
He argues that the shotgun shell was illegally seized because the search warrant authorized only a daytime search and the search was conducted at night. The shell was discovered in a barrel which was used to burn trash. The evidence shows that the search warrant was executed at approximately 4:45 p.m. on November 16, 1987. Coosa County Deputy Sheriff David Windsor testified that the warrant was executed during the daylight hours of that day. Defense counsel's argument is based on a "chart," which was not introduced into evidence either at trial or at the suppression hearing. From the argument of defense counsel, this chart apparently showed that "sunset on that date is 4:43 p.m." He argued that "I don't think whether or not it is still visibly still light outside, I don't think that is the deciding factor. I believe the deciding factor is when the sun goes down. Oftentimes, even after the sun goes down, it is still daylight outside. You can still see." In response to this argument, the district attorney noted that the chart had "a plus or minus three minutes."
"In some jurisdictions, the definition of `nighttime' is based on a factual determination of darkness, whereas others appear to take the view that `nighttime' is the time between the setting and rising of the sun, regardless of actual darkness. The federal rule now expressly defines `daytime' as `the hours between 6 o'clock a.m. and 10 o'clock p.m. local time.'"
68 Am.Jur.2d Searches and Seizures ง 110 (1973) (footnotes omitted). See also Annot., 26 A.L.R.3d 951 at งง 9, 10 (1969).
Alabama Code 1975, ง 15-5-8, states in pertinent part that "a search warrant must be executed in the daytime unless the affidavits state positively that the property is on the person or in the place to be searched, in which case it may be executed at any time of the day or night." The statute does not define "daytime" or "day or night." The purpose behind this statute is found in the recognition that "it is difficult to imagine a more severe invasion of privacy than [a] nighttime intrusion into a private home." Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958).
We have found no section in the Code of Alabama defining the terms "daytime", "nighttime", or "day and night." "`There is a generally accepted canon of statutory construction to the effect that where there is nothing to indicate to the contrary, words in a statute will be given the meaning which is accepted in popular everyday usage.'" State v. Lamson & Sessions *509 Co., 269 Ala. 610, 613, 114 So.2d 893, 895 (1959).
"Daytime" is defined as "[t]he time during which there is the light of day, as distinguished from night or nighttime." Black's Law Dictionary 358 (rev. 5th ed. 1979). In Edwards v. State, 42 Ala.App. 307, 308, 162 So.2d 894, 895 (1964), the Alabama Court of Appeals held that the State failed to show that the search was made in legal hours where the warrant was executed when it was "dark." The weight of authority supports the conclusion that where the term "nighttime" is not defined, the definition of "`nighttime' [is] based on a factual determination of darkness, rather than a rigid sunset-to-sunrise test." 26 A.L.R.3d at 975, 978. Therefore, we conclude that in the execution of a search warrant, the distinction between daytime and nighttime is to be based on a factual determination of darkness. Consequently, the trial judge properly denied the motion to suppress based on the officer's testimony that there was still daylight when the search warrant was executed.

B.
State's exhibit 32 was a note pad which allegedly belonged to the defendant. It contained notes of a conversation he allegedly had with Harvey Venn in which the defendant made notations of the questions the police had asked Venn. This pad was seized pursuant to a consent to search form signed by the defendant.
On appeal, the defendant argues that the seizure was illegal because "he was not fully advised of his rights and the significance of his consent." District Attorney's Investigator Dennis Surrett testified, without objection, that the defendant voluntarily consented to a search of his home, that he advised the defendant that "he had the right to refuse, but I was seeking permission to search his residence along with vehicles which was at his mother's house for things connected with the crime that I was investigating." The investigator testified that the defendant "appeared to read" the permission to search form and signed it. He was not in custody at that time. This testimony was not disputed either at trial or at the hearing on the motion to suppress. The objection raised on appeal was never advanced in the circuit court. Under the legal principles we set out in Hubbard v. State, 500 So.2d at 1221-22 (Ala.Cr.App.), we find that the State carried its burden of proving that the consent was fully and voluntarily given under the totality of the circumstances test.

XI.
The defendant argues that the State did not provide defense counsel in a timely manner with the statements allegedly made by the defendant to alleged police informant Orrie Goggins.
At a pretrial hearing held on August 2, 1988, the district attorney stated that he would allow the defense to listen to the tape recording "between the defendant, Orrie Goggins, and his [the defendant's] mother." The prosecutor left it up to defense counsel to "get up a time to do that." It was also agreed that the trial judge should examine Goggins's statement to the law enforcement official to determine if it contained any exculpatory evidence. Trial began on September 19, 1988, without further mention in the record of the matter.
Immediately before the defense rested its case, defense counsel inquired as to whether there had been a ruling on his motion "on the exculpatory evidence and on Orrie Goggins' statement." The trial judge indicated that he had read Goggins' statement and found it "all incriminating." With the consent of the district attorney, the trial judge gave the statement to defense counsel. Defense counsel agreed that there was nothing exculpatory in the statement.
The substance of Goggins' statement was that the defendant had offered him some money to testify that he, and not the defendant, was with Harvey Venn on the night of the crime.
Goggins testified as a witness for the State at the penalty phase of the trial. It appears that Goggins contacted law enforcement authorities to inform them of attempts by the defendant and the defendant's *510 mother to bribe him into stating that he, and not the defendant, was with Venn the night of the murder. After the State had interviewed Goggins and Goggins had given a statement to Investigator Surrett in May 1988, he agreed to call Mrs. Kuenzel and allow the State to tape-record their telephone conversation. Contrary to the district attorney's representation at the pretrial hearing in August, the tape-recorded telephone conversation was between Goggins and Mrs. Kuenzel. The defendant was not a party to that conversation.
During Goggins' testimony, defense counsel requested and received a copy of Goggins' statement and was offered the opportunity to listen to the tape recording. There was no further mention of this matter at the defendant's trial.
Our review of the record indicates that the State did not have a tape-recorded statement between Goggins and the defendant. The tape-recorded telephone conversation was between Goggins and Mrs. Kuenzel. The statement was the one Goggins gave to Investigator Surrett in May 1980. Because no statement made by the defendant was involved, and because Goggins was not a co-defendant or an accomplice, the production of the tape recording and Goggins' statement was not required under Rule 18.1(a) or (b), A.R.Cr.P.Temp. Since neither the tape recording nor the statement contained exculpatory information, their production was not required under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or Rule 18.1(f). With the few exceptions provided by Rule 18, none of which is applicable here, a defendant is not entitled to discover statements of a state's witness which are incriminating to the defendant. See Britain v. State, 518 So.2d 198, 203 (Ala.Cr. App.1987), cert. denied, 486 U.S. 1008, 108 S.Ct. 1736, 100 L.Ed.2d 199 (1988). "[T]he general rule [is] that an accused is not entitled to discover statements of government witnesses before trial." Ex parte Pate, 415 So.2d 1140, 1144 (Ala.1981) (footnote omitted).

XII.
The defendant's statement to Investigator Surrett on November 11, 1988, wherein the defendant admitted that he had been convicted of burglary and theft, was not placed in evidence before the jury. This statement was not involuntary. Because the defendant was not in custody, it was not necessary to give him his Miranda rights. Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); Annot., 31 A.L.R.3d 565 (1970).

XIII.
The defendant argues that "[t]he state failed to disclose adequately to the jury that Harvey Venn's testimony against Mr. Kuenzel was based upon a deal wherein he would receive special treatment and leniency from the government." Appellant's brief at 52. The record shows that Venn testified on cross-examination by defense counsel before the jury that he had been indicted for murder instead of capital murder, and that if he told the truth he would get a life sentence and would be eligible for parole in seven to ten years. Although the defendant argues in brief that the "particulars" of the deal were never made known, Appellant's brief at 53, he fails to state what those particulars were. There is simply no showing that the State did not make a full and complete disclosure of any "deal" it had with Venn. While the prosecution must disclose the existence of any "deals" it has with a witness, see Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the State is not required to prove the existence of that deal before the jury. This is a matter of impeachment for the defense.

XIV.
The defendant argues that the State committed reversible error by introducing evidence of an unrelated offense.
On direct examination, state's witness Harney Venn testified that, shortly before the murder, he and the defendant were together, and that they went to a drugstore and "bought some speed ... diet pills." Upon objection by defense counsel, the trial *511 judge excluded that remark. Thereafter Venn testified, without objection, that some "pills" were purchased at the drugstore and that the pills were over-the-counter-type medicine. Venn stated that later that same night, the defendant sold some of the pills to a fellow employee.
After the prosecution completed its direct examination of witness Venn, the district attorney stated, out of the presence and hearing of the jury, that the purpose of this evidence was to corroborate the co-conspirator's testimony. At the suggestion of the district attorney and at the request of defense counsel, the trial judge instructed the jury that:
"This witness used the word `speed' in his direct examination, which I excluded. And when I exclude something that means that you are not to consider it whatsoever. Then the word `pills' was used, and they bought some alleged pills and later disposed of some pills. These were over-the-counter pills, they say, from a drugstore. And there is nothing in this case about any illegal drugs."
Defense counsel announced that he was "satisfied" with these instructions.
Generally, any error in the admission of evidence is cured by its exclusion. See Mizell v. State, 184 Ala. 16, 24, 63 So. 1000, 1003 (1913). "`There is a prima facia presumption against error where the trial judge immediately charges the jury to disregard improper remarks.' Walker v. State, 428 So.2d 139, 142 (Ala.Cr.App. 1982)." Cole v. State, 548 So.2d 1093, 1097 (Ala.Cr.App.1989). See also Dockery v. State, 269 Ala. 564, 569, 114 So.2d 394, 398 (1959). The case of Tabb v. State, 553 So.2d 628 (Ala.Cr.App.1988), is factually distinguishable.

XV.
The defendant argues that he was convicted and sentenced to death on the basis of irrelevant and inadmissible evidence.

A.
The defendant argues that the State attempted to mislead the jury with regard to the fingerprint evidence because the evidence was that no fingerprint of the defendant was discovered. The defendant contends that the State should not have put on several fingerprint witnesses and sent into the jury deliberation room 26 different fingerprint exhibits, including known prints of the defendant, when there was no showing that any of that evidence implicated the defendant in the crime.
Throughout all the evidence and testimony surrounding this matter, defense counsel did not voice one objection. In his closing argument during the guilt phase of the trial, defense counsel argued the fact that there was no fingerprint evidence to connect the defendant to the crime. While the trial judge should not allow the admission of clearly irrelevant evidence, "this court has long held [that] a party cannot complain of error in his favor." Yeager v. Miller, 286 Ala. 380, 385, 240 So.2d 221, 224 (1970). See also Embrey v. State, 283 Ala. 110, 116, 214 So.2d 567, 573 (1968). The improper admission of evidence which tends to exculpate the accused constitutes harmless error under Rule 45, A.R.A.P. See Kelley v. State, 409 So.2d 909, 915 (Ala.Cr.App.1981). "Determinations of admissibility of evidence rest largely within the discretion of the [trial] court and will not be disturbed on appeal absent a clear showing of an abuse of discretion." United States v. Roper, 874 F.2d 782, 790 (11th Cir.), cert. denied, ___ U.S. ___, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989).

B.
The defendant also contends that there was error in the admission of oral, anal, and vaginal swabs taken from the victim where "there was not even the slightest suggestion in the evidence that the victim was touched in any way other than by gunshot." Appellant's brief at 60. At trial, defense counsel made no objection to any of this evidence.
We fail to see the relevance of this evidence in this particular case. However, our review of the entire record shows that the prosecution did not take unfair advantage of either this evidence or the finger-print *512 evidence in an attempt to confuse the jury or in an effort to imply the inference of facts which did not exist. We do not find that the State attempted to use this evidence to bolster a weak case against the defendant. The admission of merely immaterial and not prejudicial evidence is not reversible error. See Gilley v. Denman, 185 Ala. 561, 567, 64 So. 97, 99 (1913). "It has long been the rule that the erroneous admission of evidence on an immaterial issue is harmless." Forest Investment Corp. v. Commercial Credit Corp., 271 Ala. 8, 12, 122 So.2d 131 (1960). The admission of irrelevant evidence which could not have affected the verdict is not reversible error. Saunders v. Tuscumbia Roofing & Plumbing Co., 148 Ala. 519, 523, 41 So. 982, 984 (1906).

C.
The defendant argues that he was convicted and sentenced on the basis of inadmissible hearsay.
1. Goggins testified, over defense counsel's objection "to what was said, as being remote in time frame," to statements made by the defendant to him. "The rule is that the ... declarations ... of an accused, before or after an offense, whether a part of the res gestae or not, are admissible against him...." Shadle v. State, 280 Ala. 379, 384, 194 So.2d 538, 542 (1967). This is an exception to the "hearsay rule." A witness' testimony as to what the defendant told the witness is "hearsay" as that term is historically defined. C. Gamble, "Around and Through the Thicket of Hearsay: Dispelling Myths, Exposing Imposters and Moving Toward the Federal Rules of Evidence," 42 Ala.L.Rev. ___ (1990).
2. At the penalty phase of the trial, the defendant testified without objection, on cross-examination by the district attorney, to a conversation between himself and Orrie Goggins. At the penalty phase, Steven Cotney testified, without objection, to a conversation he had with the defendant. At the penalty phase, Goggins testified, without objection, to a statement he had made to law enforcement authorities outside the presence of the defendant, and to telephone conversations he had had with Mrs. Kuenzel and with the defendant. Defense counsel made no objection to any of this testimony.
Under the authority cited above, Cotney's testimony of his conversation with the defendant was properly admitted. Evidence of the conversations between Goggins and the defendant and those between Goggins and Mrs. Kuenzel were properly admitted to impeach both the defendant and Mrs. Kuenzel. Those conversations involved the alleged attempt by the defendant and his mother to bribe Goggins into giving false testimony in the defendant's case. "One may seek to impeach the credibility of a witness produced by his adversary by proving the witness' corrupt conduct perpetrated in the preparation for or during the trial of the present case." C. Gamble, McElroy's Alabama Evidence, ง 151.01 (3d ed. 1977).
Although the question asking Goggins to "tell the jury what [he] told [the law enforcement authorities]" sought to elicit inadmissible hearsay, Goggins' reply, that he "just let ya'll know what we was trying to do to get Billy Kuenzel out of the trouble he was in," was brief and, subsequently, was properly proven through questions to and answers by Goggins as to the conversations he had with the defendant and Mrs. Kuenzel. "[T]estimony apparently illegal upon admission may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred.... Error may be rendered harmless by prior evidence." Ex parte Bush, 474 So.2d 168, 171 (Ala.1985).

D.
The defendant now objects to the admission of a video tape depicting the crime scene. However, at trial, defense counsel announced, "We have no objection to the video." A properly authenticated video tape recording of the scene of the crime constitutes competent evidence. See Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989); Hooks v. State, 534 So.2d at 350-52. *513 Cf. Molina v. State, 533 So.2d 701, 709-12 (Ala.Cr.App.1988) (admissibility of video tape showing defendant making a telephone call). A video tape of the crime scene is admissible over the defendant's objections that the tape was inflammatory, prejudicial, and cumulative. Ex parte Siebert, 555 So.2d at 783.

XVI.
The defendant contends that error was committed in the introduction into evidence of the State's photographs of the crime scene and of the victim's body.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent.... The admission of such evidence lies within the sound discretion of the trial court.... Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds.... Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters.... Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors."
Ex parte Siebert, 555 So.2d at 783-84.
Applying these principles to the facts of this case, we conclude that the trial judge did not abuse his discretion in admitting the photographs. None of the photographs displayed the type of distortion which would render it objectionable. McElroy at ง 207.01(2). We have examined all the photographs and find that they were not so inflammatory or gruesome as to engender passion and prejudice.

XVII.
Before the attorneys made their opening statements at the guilt phase of the trial, the prosecution requested that "Kenneth Brasher with the Sylacauga Police Department be exempt from the rule." Brasher subsequently testified at trial before the jury.
"The exclusion of all witnesses, except the one under examination, from the court-room during the trial is not a matter of right, but is one within the sound discretion of the trial judge." Teague v. State, 245 Ala. 339, 340, 16 So.2d 877, 878 (1944). "It is within the discretion of the trial judge to excuse some witnesses and not others from the operation of `the rule' of exclusion." Weatherford v. State, 369 So.2d 863, 865 (Ala.Cr.App.) cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979) (citing cases upholding the judge's discretion in excusing law enforcement officers).

XVIII.
The defendant argues that he was convicted and sentenced solely on the basis of the uncorroborated testimony of an accomplice in violation of Ala.Code 1975, ง 12-21-222.
The evidence does show that the defendant committed the crime set out at ง 13A-5-40(a)(2): "Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." As required by ง 13A-5-47(d), the trial court entered written findings of facts summarizing the crime and the defendant's participation in it. Those findings are supported by the record.
"The Defendant, Kuenzel, and Co-Defendant, Harvey Venn, lived together and also worked together at the Maddix Corporation in Goodwater, Alabama, a city a short distance from the place where the crime was committed. Venn, the Co-Defendant and driver of the vehicle, which he owned at the time the crime was committed, was indicted for non-capital murder for his participation in the crime for which the Defendant Kuenzel stands convicted. The Defendant *514 Kuenzel was 25 years of age at the time the crime was committed, and Venn was 19 years of age.
"On the night of November 9, 1987, Kuenzel and Venn traveled to Sylacauga, Alabama, located in Talladega County, rather early in the afternoon [sic]. They were just cruising around seeing about incidental personal matters, drinking beer and allegedly smoking some pot.
"In the course of the afternoon they went to or passed by Joe Bob's Crystal and Convenience Store on several occasions. They purchased some over-the-counter drugs at a Sylacauga drug store and returned to Goodwater and sold them to a fellow employee. Thereafter they again returned to Sylacauga.
"During the occasion of their travels that evening they had in their possession one 16 gauge, single barrel shotgun, the ultimate death weapon; one .32 caliber automatic pistol; and one 12 gauge, single barrel shotgun.... Kuenzel had one or more 16 gauge shotgun shells loaded with # 1 buckshot in his possession.
"At some point in the evening Kuenzel told Venn he knew where he could pick up some easy money. His plan was formulated to rob the convenience store. The pair again checked the convenience store about 10:45, and there were other customers there. In the meantime the Defendant, Kuenzel, covered the license plate on Venn's car with a paper sack. the last sale shown on the cash register at the convenience store was at 11:05 p.m. Shortly after 11:05 p.m. at which time there were no customers present, Kuenzel and Venn returned to the convenience store. The cashier and victim, Linda Offord, was in the store alone sitting on a stool behind the cash register. The Defendant, Kuenzel, put on a ski mask, took the 16 gauge shotgun loaded with # 1 buckshot, held the gun by the side of his leg and entered the store alone for the purpose of committing the robbery. Venn remained in the car. In just a matter of seconds one shot was fired. The victim was at about point blank range from the muzzle of the shotgun. Ten of the # 1 buckshot penetrated and passed through the victim's body and two remained lodged therein. The blast from the shotgun was of such intensity that her leg was broken when she was blown from the stool. The victim fell to the floor. Kuenzel ran out of the store, got in the car with Venn and told him to `haul ass.'
"The victim was discovered by the third shift employee, who was supposed to relieve her at 11:00, but who did not arrive until about 11:20. The victim was still alive at that time, but died on the way to the emergency room as a result of the wounds inflicted on her by the Defendant, Kuenzel.
"The death of the victim was the result of murder by the Defendant, Kuenzel, of the intentional killing type during a robbery in the first degree or an attempt thereof, being a capital offense as set out in Section 13A-5-40(a)(2), and the jury so found."
The corroboration of the testimony of the accomplice is supplied by the evidence that the defendant and Venn were seen together shortly before and after the crime. Venn testified that he and the defendant drove in his automobile to the Crystal Station between 10:00 and 10:30 p.m. where they planned to wait in the car until "everything cleared out." However, because there were still people in the store, they left and returned about 11:00 p.m. When "everything cleared out," the defendant went inside the store and shot the clerk.
Excluding Venn's testimony, the evidence shows that the murder was committed shortly after 11:00 p.m. April Harris testified that she saw Venn's car at the store between 9:30 and 10:00 p.m. and that she saw both Venn and the defendant inside the store at that time. Other witnesses testified that Venn and an unidentified white male were at the store sitting in Venn's automobile around 10:00 or 10:30 p.m. In our opinion, this testimony, while certainly not overwhelming, was sufficient to corroborate Venn's testimony and to satisfy the requirements of ง 12-21-222.

*515 "This Court set forth the legal principles governing this issue in Kimmons v. State, 343 So.2d 542 (Ala.Crim.App.1977). Our Supreme Court summarized them in Senn v. State, 344 So.2d 192, 193 (Ala. 1977):
"`Being seen in the company of an accomplice in close proximity in time and place to the commission of a crime is not in itself always sufficient corroboration to meet our statutory requirements. Tidwell v. State, 37 Ala.App. 228, 66 So.2d 845 (1953, per Harwood, J.). On the other hand, if the accused and accomplice are seen together in unusual places and in close proximity in time and place to the scene of the crime, which was committed at an unusual hour, the requirements of corroboration may be met. Tidwell, supra.' (Emphasis in original.)
"Here, in conjunction with the facts of association and proximity, the testimony of the accomplice is corroborated by the unusual place and unusual hour of this association. Senn, supra; Kimmons, supra. The corroboration of an accomplice may be shown by circumstantial evidence. Mathis v. State, 414 So.2d 151, 155-56 (Ala.Crim.App.1982); Tidwell v. State, 23 Ala.App. 409, 410, 126 So. 186 (1930)."
Jackson v. State, 451 So.2d 435, 436-37 (Ala.Cr.App.1984). See also Craig v. State, 376 So.2d 803, 805-06 (Ala.Cr.App.), cert. denied, 376 So.2d 807 (Ala.1979). "[T]he statute does not require corroborative testimony as to material elements of the crime; it only requires other evidence `tending to connect the defendant with the commission of the offense.'" Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). The testimony of an accomplice must be corroborated "by other evidence tending to connect the defendant with the commission of the offense," but it is not necessary that there should be other evidence which would, of itself, warrant a conviction. Lumpkin v. State, 68 Ala. 56, 57-58 (1880). Here, there was sufficient corroboration of the testimony of the accomplice. Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979). The credibility of the witnesses who supplied the corroboration of the accomplice's testimony was for the jury and not an appellate court. See Reeves v. State, 186 Ala. 14, 21, 65 So. 160, 162 (1914). "It is basic that in consideration of the sufficiency or insufficiency of the evidence to support the verdict, we cannot weigh the evidence or test the credibility of the witnesses." Walker v. United States, 301 F.2d 94, 95 (5th Cir. 1962). Accord, Granger v. State, 473 So.2d 1137, 1139 (Ala.Cr.App.1985).

XIX.
The defendant argues that the State's evidence is insufficient to support a guilty verdict because the State offered no evidence of intent to kill, no evidence of robbery, and insufficient evidence of intent to rob. We reject these arguments.
According to Venn, on the night of the crime, the defendant told him that they could obtain "some easy money" at the Crystal Station. The two men watched the store until it was empty of customers. The defendant put on an orange ski mask and entered the store armed with a 16 gauge shotgun. The defendant shot the clerk, ran to the car and told Venn to "haul ass." Although Venn testified that the defendant told him that he "didn't mean to do it," he also testified that immediately after that the defendant "pulled the pistol out from under the seat and said, `What happens to one can happen to another.'" In our opinion, this remark tends to negate the defendant's claim of an accident.
Venn testified that the defendant also stated that "it was a shame that she had to get killed over some money that wasn't even hers to begin with." According to Venn, the defendant said that "he went in there and put the gun on the counter and told her to give him the money and she said, `Do you mean the money in the register?' and he said, `yeah,' and she said, `Well, you can't have it. Go ahead and pull the trigger.'" Venn testified that the defendant said "he shot and run out, and said it was an accident." Expert testimony *516 proved that the shotgun could not be fired "unless the trigger is pulled."
The offense of robbery as defined in ง 13A-8-43(a) does not require the actual taking of property. Tarver v. State, 500 So.2d at 1248-49. "The use of a deadly weapon, under proper circumstances, gives rise to the permissible legal presumption of both malice and intent." Ex parte Bayne, 375 So.2d 1239, 1244 (Ala.1979).
"The standard for determining the sufficiency of the evidence to sustain a conviction is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt." Ex parte Hinton, 548 So.2d at 568. "The evidence presented by the State is to be viewed in the most favorable light when deciding upon sufficiency of the evidence." Id. at 569. In White v. State, 546 So.2d 1014, 1016-17 (Ala.Cr.App.1989), this Court set out the standards for appellate review of the sufficiency of the evidence. Applying those principles to the facts of this case, we find that the evidence is abundantly sufficient to support the conviction of the defendant for the capital offense of robbery-murder as charged in the indictment.

XX.
During the course of the guilt phase of the trial it was discovered that after the trial had been recessed for the day, one of the special bailiffs attending the jury went to the jail to pick up some clothes for a juror. The bailiff took juror Barbara Griffin with him to allow her to move her car after he collected the clothes for another juror. As they were leaving the jail, Ms. Griffin was startled by a man she saw in a cell. Upon learning of this, defense counsel requested a mistrial or, in the alternative, removal of the juror.
Upon examination by the trial judge, Ms. Griffin testified that she had never seen the man she saw in the cell and did not recognize him. She testified that it scared her because it was dark and "you know it took my breath because I didn't think there was anybody in them." She stated that anything that happened on that occasion would not affect her opinion or bias her verdict in any way. At the request of defense counsel and with the specific and affirmative consent of the defendant, the juror was removed and replaced by one of the alternate jurors. Although Ms. Griffin was not asked, there is absolutely no indication in the record that she communicated her experience in the jail to any other juror.
This issue was a ground of the defendant's motion for new trial. In overruling the motion, the trial judge specifically found that "[t]here was no prejudicial effect to the defendant as a result of said incident nor were any of the defendant's substantial rights violated."
Alabama Code 1975, ง 13A-5-44(b), states: "The separation of the jury during the pendency of the trial of a capital case shall be governed by applicable law or court rule." In a capital case, the consent of the defendant, defense counsel, and the prosecuting attorney are necessary before the trial judge may allow the jury to separate. ง 12-16-9(a). There is no separation agreement contained in the record on appeal. However, in this case there was not the kind of separation of the jury which raises a presumption of prejudice and which casts the burden upon the state to affirmatively show that no injury resulted to the defendant.
Ms. Griffin was accompanied by a bailiff. See Bates v. State, 41 Ala.App. 429, 430, 134 So.2d 216, 217 (1961) (no improper separation of jury was established by showing that after jury was dismissed for noon recess bailiff remained in hall outside door of register's office with 11 jurors and allowed 12th juror to go to men's room of the solicitor's office). "[T]he court may permit a short separation of one or more of such jurors for a necessary purpose, ... when accompanied by such officer [in charge of the jury]." Arnett v. State, 225 Ala. 8, 9, 141 So. 699 (1932). We find no basis for error in this regard.

XXI.
The defendant argues that certain instructions of the trial judge at the guilt phase of the trial were improper. At the *517 conclusion of the oral charge defense counsel announced "satisfied."

A.
In the guilt phase of the trial, the trial judge instructed the jury that "it would be your duty" to convict if it found the defendant guilty of the capital offense charged in the indictment.
The proposition is well established that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "[W]here a portion of the court's oral charge is erroneous, the whole charge may be looked to, and the entire ... charge must be construed together to see if there was reversible error." Wright v. State, 269 Ala. 131, 132, 111 So.2d 596 (1958).
"The entire charge must be construed as a whole. Harris v. State, 412 So.2d 1278, 1281 (Ala.Cr.App.1982). When reviewing a judge's oral charge, `each statement made by a judge to the jury should be examined in light of the entire charge and ... isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial.' United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir. 1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977).
`"The language of a charge must be given a reasonable construction, and not a strained and unreasonable one."' Harris v. State, 394 So.2d 96, 100 (Ala. Cr.App.1981). `(F)anciful theories based on vagaries of the imagination' should not be indulged in construing the court's charge. Addington v. State, 16 Ala. App. 10, 19, 74 So. 846 (1916)."
Kennedy v. State, 472 So.2d 1092, 1103 (Ala.Cr.App.1984), affirmed, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."
Boyde v. California, 494 U.S. at ___, 110 S.Ct. at 1198. In Boyde, the United States Supreme Court held that the mandatory language in jury instructions listing the factors that the jury "shall consider, take into account and be guided by" in determining whether to impose a sentence of death or a sentence of life imprisonment did not violate the Eighth Amendment by precluding the jury from evaluating the absolute weight of aggravating circumstances and determining whether they justified the death penalty. 494 U.S. at ___, 110 S.Ct. at 1196. See also Blystone v. Pennsylvania, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).
In a very real sense, a jury does have the "duty" to convict the accused of the offense charged in the indictment if it finds the accused guilty of that offense beyond a reasonable doubt. "A jury is not empowered to waive the law or any of its rulesโ its only power is to take the law of the case as given by the trial judge and apply it to the facts as developed on the trial. Out of this process comes the verdict." Patterson v. State, 45 Ala.App. 229, 236, 228 So.2d 843, 849 (1969). "Admonition of the high and sacred duty resting upon juries by nisi prius judges should be encouraged rather than condemned." Hope v. State, 21 Ala. App. 491, 492-93, 109 So. 521, 522 (1926). See also Dolan v. State, 81 Ala. 11, 16-17, 1 So. 707, 711 (1887). The trial judge did not violate the principle that "[c]ourts may instruct the jury as to the law of the case, but they may not instruct a jury as to what verdict they shall render in a criminal case on a given statement of facts." Woodham v. State, 28 Ala.App. 62, 64, 178 So. 464, 466 (1938).

B.
The trial judge instructed the jury of the sufficiency of the corroborating evidence of the testimony of the accomplice as follows:

*518 "Now, we have a statute in this state which provides as follows: That is section 12-21-222:
"Accomplice testimony for felony convictions. A conviction of felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstance[s] thereof is not sufficient.
"An accomplice is a partaker or partner in guilt and includes one who is present, aiding, abetting, assisting and encouraging the commission of a crime. To say that the testimony of an accomplice must be corroborated means that the testimony of an accomplice must be strengthened, not necessarily the proof of any particular fact to which the accomplice has testified, but the probative, criminating force of his testimony. The corroborating testimony need not necessarily refer to any facts testified to by the accomplice, but may also include proof of mere circumstances tending to prove the truth of the material features of the testimony of the accomplice. The corroborating testimony is not sufficient if it merely shows the commission of the offense or the circumstances thereof."
We agree that this oral charge is not as clear as it should be. To the extent that it tends to indicate that the corroboration essential to a conviction includes facts and circumstances ascertained in checking up on the accomplice's version of the affair and matters tending to support the truth of his testimony, and omits reference to the type of corroboration which tends to connect the accused to the commission of the crime, the charge is erroneous. Thompson v. State, 374 So.2d 388, 389 (Ala.1979). However, although we do not approve or recommend this charge, we find that it does not constitute plain error.
"The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538 (1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala.App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935)."
Andrews v. State, 370 So.2d 320, 322 (Ala. Cr.App.), cert. denied, 370 So.2d 323 (Ala. 1979).

C.
The defendant now objects to the portion of the trial judge's oral charge on alibi wherein he stated: "If the jury believes, beyond a reasonable doubt, that the alibi set up in this case is simulated, false, or fraudulent, you may consider this as a circumstance against the defendant, in connection with all of the other evidence in the case."
In Thacker v. State, 225 Ala. 1, 2, 142 So. 580, 581 (1932), the following jury charges were approved:
"I charge you, ... that if after a consideration of all the evidence in this case, if you believe from the evidence in this case, the alibi of the defendant was not interposed in good faith or that the evidence to sustain it is simulated, false and *519 fraudulent, then, this is a discrediting circumstance to which you may look in connection with all the other evidence in determining the guilt or innocence of the defendant.
"I charge you, ... that in weighing the testimony of an alibi, you must give that the same weight as you would any other material fact in the case. If the defendant should fail in any way or in any manner in the proof of this alibi, it is a circumstance that may be weighed against the defendant in connection with the other evidence."
On the basis of Thacker, we find no error in the oral instruction of the trial judge.

D.
The trial judge charged the jury on murder, felony murder, manslaughter, and robbery as lesser included offenses of the crime of capital robbery-murder. While perhaps the instructions in this regard could have been more comprehensible and explicit, the trial judge made it clear that the jury could find the defendant guilty of one of these lesser included offenses. The instructions to the jury on this matter do not constitute plain error.

E.
The trial judge properly charged the jury that a reasonable doubt "could arise out of the testimony in the case, or it could arise from a lack of testimony in the case." "It is proper to charge, and error to refuse to charge, that a reasonable doubt may arise either from the evidence or a want of evidence." Stafford v. State, 33 Ala.App. 163, 168, 31 So.2d 146, 150 (1947). However, as pointed out in Darby v. State, 516 So.2d 775, 784 (Ala.Cr.App.1985), reversed on other grounds, 516 So.2d 786 (Ala.1987), the failure to give such a charge may not constitute reversible error where the jury is instructed on the reasonable doubt standard as applied to the evidence in its totality. Lambeth v. State, 380 So.2d 923, 925 (Ala.1979). Despite this, the proposition itself remains valid. The burden of proof is on the State to prove the accused guilty beyond a reasonable doubt. See Chavers v. State, 361 So.2d 1106, 1108-09 (Ala.1978). "Such doubt may be generated from a lack of evidence as well as from the evidence." Davis v. State, 290 Ala. 364, 365, 274 So.2d 363, 364 (1973) (Heflin, C.J., dissenting from denial of petition for writ of certiorari) (emphasis in original).

XXII.
The defendant argues that the trial judge erred in his written findings of fact required by Ala.Code 1975, ง 13A-5-47(d). The defendant now asserts that the findings of fact of the trial judge are based upon illegal evidence, inadmissible hearsay, and the uncorroborated testimony of an accomplice. Defense counsel raised no objection to this issue in the trial court.
Contrary to this argument, our review of the entire trial proceedings shows that the findings of the trial judge are accurate and are fairly supported by the evidence and the testimony admitted at trial. The defendant's argument is without merit.

XXIII.
The defendant argues that the state failed to inform the jury at the penalty phase of the trial that state witness Orrie Goggins had "a strong motivation to lie about his involvement with appellant," and that Goggins could be held criminally liable for his participation in the conspiracy. Appellant's brief at 80. In Part XIII of this opinion, this Court rejected a similar argument raised by the defendant with regard to witness Harvey Venn.
Goggins testified to the attempt by the defendant and Mrs. Kuenzel to bribe him into testifying that he, and not the defendant, was with Venn on the night of the murder. On direct examination by the district attorney, he admitted that he was serving a 15-year sentence for possession of marijuana and that he had prior convictions for theft of property, grand larceny, and escape. On cross-examination, defense counsel established that at the time of the bribery attempt, Goggins had a case pending in Talladega County, but Goggins denied that anyone told him they would help *520 him on his case if he would help "set up" the defendant.
Under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the prosecution has a constitutional duty to disclose to the defendant any "deal" it has with the witness. Furthermore, the prosecution has a constitutional duty to correct a witness' false testimony that the witness had received no promise of consideration in return for his testimony. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
Even though "capital cases by their very nature are sufficiently different from other cases to justify the exercise of judicial authority to order discovery from the prosecution" beyond that required by either the constitution or state rule, Ex parte Monk, 557 So.2d 832, 836-38 (Ala.1989), the defendant's argument on this issue must fail because there is absolutely nothing in the record to contradict Goggins's testimony that he had been given no promise of leniency or other consideration in exchange for his testimony. The defendant's argument is grounded on pure speculation and conjecture.

XXIV.
The defendant argues that the trial judge made numerous errors in his oral charge at the penalty phase of the trial. Again, we must note that at the conclusion of the court's oral charge at the penalty phase, defense counsel affirmatively indicated that he was satisfied with that charge.

A.
The trial judge instructed the jury as follows:
"The law provides only two punishments for a capital offense. That is, death or life imprisonment without parole. The law provides that which of these punishments should be imposed upon the defendant depends upon whether aggravating circumstances exist and if so, whether the aggravating circumstances outweigh the mitigating circumstances."
This charge was proper and accurately summarizes the content of Ala.Code 1975, ง 13A-5-46(e). This charge is identical in all material aspects to the relevant portion of the "proposed pattern jury instructions for use in the sentence phase of capital cases tried under Act No. 81-178" submitted by the Alabama Bar Institute for Continuing Legal Education in October of 1982. By order dated December 6, 1982, the Alabama Supreme Court ordered "[t]hat the use of the pattern jury instructions,... for the trial and sentencing aspect of cases tried under ง 13A-5-40(a), Code of Alabama, 1975, is recommended, but without prejudice to the right of any defendant to make and preserve for review in a timely manner any objection thereto either as to form, substance or application."
The "plain error" rule applies to oral instructions to the jury in capital cases. Ex parte Harrell, 470 So.2d 1309, 1312 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). In that case, one of the two considerations of the Alabama Supreme Court in refusing to apply the plain error rule to the trial judge's failure to instruct the jury on a particular matter was the fact that "[t]he trial court's instruction follows the pattern jury instruction `recommended' by this Court." Harrell, 470 So.2d at 1314. "[W]e do not think we should hold that the trial judge plainly erred when he instructed the jury pursuant to a pattern jury instruction `recommended' by this Court, especially in the absence of an objection or request from the defendant." Harrell, 470 So.2d at 1315 (emphasis in original).
Not only do we not find "plain error," we reject the defendant's contention that this instruction "unduly restricted the jury's consideration of mitigating evidence and denied the jury its constitutional prerogative to impose [a sentence of] life [imprisonment]." Appellant's brief at 83. The essence of the defendant's argument is that the jury always retains the option to impose life without parole "whatever its calculus as to aggravators and mitigators." Appellant's brief at 84. This argument *521 was rejected in Boyde v. California, 494 U.S. at ___, 110 S.Ct. at 1196:
"Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances `outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence `in an effort to achieve a more rational and equitable administration of the death penalty.' Franklin v. Lynaugh, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988) (plurality opinion). Petitioner's claim that the `shall impose' language of [the California statute] unconstitutionally prevents `individualized assessment' by the jury is thus without merit."
Alabama's statutory scheme is not impermissibly "mandatory" as that term was understood in Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).
"Death is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances. This is sufficient under Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978),] and Penry [v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)]."
Blystone v. Pennsylvania, 494 U.S. at ___, 110 S.Ct. at 1082-83 (footnote omitted). Alabama's "statutory sentencing scheme does not provide, that if even one aggravating circumstance is found, `death is presumed to be the proper sentence' unless overcome by sufficient mitigating circumstances." Cochran v. State, 500 So.2d 1161, 1178 (Ala.Cr.App.1984), affirmed in part, reversed in part on other grounds, 500 So.2d 1179 (Ala.1985), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987). Neither the oral charge of the trial judge nor Alabama's statutory sentencing scheme "presumes" that death is the appropriate punishment upon the finding of the existence of at least one aggravating circumstance. Compare, Jackson v. Dugger, 837 F.2d 1469, 1473-74 (11th Cir.), cert. denied, 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988).

B.
In Part VII of this opinion, this Court addressed the defendant's argument that the trial judge's instruction that one aggravating circumstance had been proved by the jury's verdict in the guilt phase punished the defendant twice for the same act and placed upon him the burden of overcoming a presumption that he should receive a sentence of death.

C.
The defendant argues that the jury may have believed that a mitigating circumstance had to be found unanimously before any of one juror could vote for life imprisonment. Under Mills v. Maryland, 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988), a sentence of death must be vacated where "there is a substantial probability that reasonable jurors, upon receiving the judge's instructions ..., well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."
We have examined the complained of portion of the trial judge's charge on mitigating circumstances and find that it is in accordance with the pattern jury instruction and in accordance with ง 13A-5-45(g). Therefore, we find no plain error. Harrell, supra. The basis of the defendant's argument lies in the fact that the trial judge "used the collective `you' throughout its instructions." The defendant contends that "[i]t would be perfectly reasonable for a juror to conclude ... that `you' means all of you, unanimously, when determining whether a mitigating circumstance existed." Appellant's brief at 92.
*522 We reject this contention as did the Alabama Supreme Court in Ex parte Martin, 548 So.2d 496, 499 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989):
"The charge to the jury in the instant case was in accordance with the pattern jury instruction and in accordance with Ala.Code 1975, ง 13A-5-45(g). The jury was told that the defendant had the burden of injecting an issue of mitigating circumstances, but that once it was injected the state had the burden of disproving the factual existence of any mitigating circumstances by a preponderance of the evidence. There was no jury charge or verdict form to indicate that at least 10 jurors must agree on the existence of a mitigating circumstance.
"We have considered the trial court's charge to the jury in light of the holding in Mills and are of the opinion that the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor."

D.
The defendant argues that the trial judge's oral instruction on intoxication was error. At the guilt phase of the trial, the trial judge charged the jury on intoxication as a defense in accordance with ง 13A-3-2. The trial judge did not define or explain "intoxication" at the penalty phase. The defendant argues that an application of the instructions at the guilt phase of the trial results in the failure of the trial judge to explain intoxication as a mitigating factor for the jury to consider at the penalty phase.
This court rejected a similar argument in Kennedy v. State, 472 So.2d at 1103-04. In that case this court found no conflict in the judge's instructions in the guilt and sentencing phases of the trial, despite the fact that the trial judge there instructed the jury at the penalty phase to apply the same rules of law concerning the evaluation of testimony presented during the guilt phase of the trial. Here, no such instruction was given. We reject the defendant's argument in this case for the same reasons we rejected the similar argument in Kennedy.
In Thompson v. State, 503 So.2d at 881, this Court found that voluntary intoxication would not constitute the mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, for purposes of a capital sentencing proceeding, where the defendant did not show that he was so intoxicated as to render himself incapable of appreciating his conduct. That principle has equal application here. See also Ex parte Jones, 520 So.2d 553, 555 (Ala.), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988) (fact that defendant was intoxicated at the time of the double slayings and fact that other culprit involved told him what to do did not constitute mitigating factors).

E.
The trial judge did instruct the jury that, in addition to the statutory mitigating circumstances, mitigating circumstances "shall include any aspect of a defendant's character or record, and any of the circumstances of the defense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstances which the defendant offers as a basis for a sentence of life imprisonment without parole, instead of death." (Emphasis added.) This instruction is identical to the language of ง 13A-5-52 with the one exception that the statute uses the term "offense" instead of "defense" as used by the trial judge. We do not consider this matter of any significance, even assuming no error on the part of the court reporter and that the trial judge actually used the term "defense." A reading of the entire oral charge makes it clear that a mitigating circumstance may include any aspect of the defendant's character or record and any of the circumstances of the offense. Cf. Currington v. State, 350 So.2d 711, 714 (Ala.Cr.App.1977) (where defendant objected to one aspect of court's *523 charge on meaning of "not guilty," consideration of charge in its entirety revealed that court fully and clearly instructed the jury on this point). "Hypercriticism should not be indulged in in construing charges of the court." Addington v. State, 16 Ala. App. 10, 19, 74 So. 846, 855 (1916). This Court may take notice of typographical errors which are "plainly ... self-corrective, clerical mistake[s]." Stewart v. State, 137 Ala. 33, 43, 34 So. 818, 821 (1903).

XXV.
The defendant argues that the trial judge coerced the jury into returning a verdict of death. "Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." Lowenfield v. Phelps, 484 U.S. at 241, 108 S.Ct. at 552.
The record shows that after it had been deliberating, the jury reported that it had reached a verdict. When the jury's verdict was handed to the trial judge, the judge responded:
"Members of the jury, this verdict form does not comply with my instructions. I am sorry I didn't explain it better. But a recommendation for life without parole, you have to have at least seven vote for life without parole. And for the death sentence, you have to have at least ten to vote for death. So, you will have to go back and continue your deliberations. Does counsel care to look at this? To see if you have any exceptions to my charging the jury?
"(COUNSEL CAME UP TO THE BENCH AND VIEWED THE VERDICT FORM.)
"THE COURT: Are you satisfied with those instructions?
"MR. WILLINGHAM [defense counsel]: Yes, sir.
"THE COURT: Are you satisfied for the State?
"MR. RUMSEY [district attorney]: Yes, sir.
"THE COURT: At this time you may retire and continue your deliberations."
After an undisclosed period of further deliberation, the jury returned with a unanimous recommendation that the defendant be punished by death: "We the jury recommend that William Ernest Kuenzel be punished by death. For death: 12. For life imprisonment without parole: zero." The record reflects that "the court polled the jury by asking each, individual juror, `Is this your verdict?' and the court received twelve affirmative replies." There was no objection made by defense counsel at trial to the procedure followed by the trial court in this matter. This issue was not raised in the defendant's motion for new trial. By failing to object, the defendant has not waived this issue, although the failure to object does "weigh against Defendant as to any possible claim of prejudice." Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). "[S]uch an omission indicates that the potential for coercion argued now was not apparent to one on the spot." Lowenfield, 484 U.S. at 240, 108 S.Ct. at 552 (footnote omitted).
In Lowenfield, supra, the trial judge ordered continued deliberations after the jury had informed the judge of its failure to reach a verdict. The United States Supreme Court held that the trial judge did not impermissibly coerce the jury to return a death sentence when he polled the jury twice as to whether further deliberations would be helpful and reinstructed the jury to continue deliberations.
In Thomas v. Jones, 891 F.2d 1500 (11th Cir.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990), the trial judge learned of the jury's indecision in recommending a sentence after the jury had been deliberating for approximately two hours. The trial judge then recessed the jury for the evening and, the next morning, instructed the jurors to resume deliberations. In that case, the Court of Appeals for the Eleventh Circuit found no error:
"[The trial judge] did not order continued deliberations in response to the jury's claim of indecisiveness, but rather, he permitted the jury to reconvene to resume discussions which they had not yet *524 completed. We find this situation to be inherently less coercive than the situation with which the Lowenfield jurors were faced. Hence, if the Supreme Court found no error in the actions of the Lowenfield judge, then we certainly find that the judge in this case committed no error in allowing the jury to continue deliberations."
Thomas, 891 F.2d at 1504.
In both Lowenfield and Thomas, the court found that the trial judge did not coerce the jury into recommending a death sentence. The present case does not fit squarely within the factual situation present in Lowenfield, where the jury indicated that it was unable to reach a verdict, or that present in Thomas, where the trial judge interrupted the jury's deliberations and learned that the jury had not yet reached a verdict. In this case, the jury had reached an improper verdict.
The defendant alleges that the first verdict of the jury was eight for the death penalty and four for life without parole. This is not supported by anything in the record before this court. However, it does appear that the first verdict of the jury was not proper under ง 13A-5-46(f), which provides:
"The decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors. The decision of the jury to recommend a sentence of death must be based on a vote of at least ten jurors. The verdict of the jury must be in writing and must specify the vote."
The jury's first verdict was not responsive to the instructions of the trial judge or to the requirements of law.
"Nothing seems better settled than that it is the duty of the court to look after the form and substance of the verdict of the jury, so as to prevent an unintelligible or insufficient verdict from passing into the records of the court." Martin v. State, 29 Ala.App. 395, 396, 196 So. 753, 753-54 (1940). Accord, Bentley v. State, 20 Ala. App. 635, 104 So. 679 (1925). The instructions of the trial judge sending the jury back for further deliberations did not constitute a directed verdict or deprive the defendant of the "leniency of the jury." United States v. Walker, 456 F.2d 1037, 1039 (5th Cir.1972). Where the verdict of the jury is not responsive to the instructions of the trial judge and the requirements of the law, the trial judge has a duty to reject that improper verdict and require the jury to resume its deliberations. Doughty v. State, 228 Ala. 568, 570, 154 So. 778, 779-80 (1934).
There is no indication in this case that the jury was deadlocked or unable to reach a proper verdict. Compare, Ex parte Giles, 554 So.2d 1089, 1092 (Ala.1987). The trial judge never indicated for which punishment the jury should vote. Here, it appears only that the jury misunderstood the instructions of the trial judge. This is not a case of coercing or directing a verdict. Applying the principles of Lowenfield, supra, and Thomas, supra, we find no error.

XXVI.
The defendant argues that the trial judge, before sentencing the defendant to death, should not have considered the presentence investigation report filed by the Alabama Board of Pardons and Paroles.
Alabama Code 1975, ง 13A-5-47(b), provides:
"Before making the sentence determination, the trial court shall order and receive a written presentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case."
See also ง 13A-5-5 (authorizing a presentence investigation); Rule 3, A.R.Cr.P. Temp. (governing when an investigation report *525 is required, its contents, and the availability of the report).
In making the determination of sentence, the trial judge must take into consideration the presentence investigation report and any evidence submitted in connection with it, in addition to the evidence presented at trial and during the sentence hearing. See ง 13A-5-47(d) and (e).

A.
The defendant argues that the parole officer's interview with the defendant violated his constitutional right against self-incrimination under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Neither ง 13A-5-47(b), ง 13A-5-5, nor Rule 3 makes any specific reference to the "subject's statement" as a portion of a presentence investigation report. The defendant argues that under Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Fifth Amendment to the Constitution of the United States precludes the State from subjecting a capital defendant to questioning for use at sentencing without first informing the defendant that he has a right to remain silent and that anything he says can be used against him at a sentencing proceeding. The defendant argues that such questioning also involves the defendant's constitutional right under the Sixth Amendment to notification of counsel of such questioning. See also, Powell v. Texas, 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989). However, we need not decide these issues because a violation of these rules against the admission of the defendant's statements is subject to the harmless error rule. See Satterwhite v. Texas, 486 U.S. 249, 257-58, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988).
The presentence investigation report in this case consists of nine pages. In the trial judge's "consideration and findings of the court in determination of sentence," required by ง 13A-5-47(d), the trial judge stated that "[c]opies of the Pre-Sentence Report were furnished to both the attorneys for the Defendant and the District Attorney." The trial judge also indicated that he had considered the presentence report in making his determination of sentence.
Under the "subject's statement" portion of the presentence investigation report appears the following:
"William Ernest Kuenzel when interviewed by this officer emphatically denied having committed this offense. He maintains his plea of not guilty even after the jury verdict and after the jury recommendation of sentence. Since this case is expected to be appealed he did not desire to comment further about it."
In the "personal/social history" portion of the presentence report there appear several statements unrelated to the crime and beginning with the phrase, "He claims," e.g.: "He claims that he was reared primarily by his mother ..."; "Subject claims he was married to ..."; "Subject claims that he is in good health ..."; "He states he has no alcohol dependencies ..."; "He claims addiction to Valium, LSD, cocaine and Dilaudid"; and "Subject claims he was in normal academic classes when in high school."
At the sentencing hearing before the jury, the defendant testified in his own behalf and denied having committed the crime. He stated:
"Well, for about the six months right before I got this charge, I was, I guess you would say really an alcoholic. I drank a lot. For the past two or three years I have been on valiums a lot. And marijuana. I, you know, did LSD a few times, quite a few times. And Dilaudids for a while.
"But not to where I was addicted to anything but the valium."
At this same hearing, defense witness Don Weathington, a licensed counselor, testified on direct examination by defense counsel that in his interview with the defendant the defendant "[s]tated that he had gotten involved with the drug culture pretty heavily." Weathington testified:
"He told me that he had extensive experience with drugs. All kinds of drugs. Including marijuana, cocaine, LSD, Dilaudid, which is an opiate. And Valium.

*526 "He also told me that he considered himself to be addicted to the alcohol and to valium.
"....
"Now, in his particular case, what we suspect about him, from his own words, he says he got so heavily involved in the drug culture that he does not have very good personal limits."
At the sentencing hearing before the trial judge, held pursuant to ง 13A-5-47, the defendant urged that a "mistake had been made" and that he was being sentenced "for a crime of which [he was] not guilty". In Thompson v. State, 503 So.2d at 880, this Court held:
"The argument by the appellant that he was prejudiced by the inclusion of a statement made by him to the probation officer when it was not shown that such statement was voluntary or preceded by Miranda warnings is likewise without merit. The statement is entirely consistent with, and identical to, the appellant's own testimony at the guilt phase of the trial and during the sentence hearing."
In view of the testimony presented by and on behalf of the defendant at the sentencing hearings, we find that the statements attributed to the defendant in the presentence investigation report are constitutionally insignificant. Applying the harmless error standard expressed in Satterwhite, 486 U.S. at 257-58, 108 S.Ct. at 1798, we find beyond a reasonable doubt that the inclusion of these statements in the presentence report did not contribute to or affect the trial judge's imposition of the death penalty.
We note that in United States v. Jackson, 886 F.2d 838, 842 n. 4 (7th Cir.1989), the court observed that a federal probation officer did not constitute a person acting on behalf of government prosecutors, and thus held that the admission of custodial statements made by a defendant to the probation officer as part of the presentence investigation did not violate the defendant's Fifth Amendment privilege against self-incrimination. Citing Brown v. Butler, 811 F.2d 938 (5th Cir.1987), and Baumann v. United States, 692 F.2d 565 (9th Cir.1982), the court also held that "the sixth amendment right to assistance of counsel did not extend to [the defendant's] presentence interview by the federal probation officer." Jackson, 886 F.2d at 845 (footnote omitted).

B.
The defendant argues that the trial judge should not have considered the presentence report because it contained information on the victim's family.
The presentence report contained a section entitled "victim notification information," which listed the victim's survivors (father, mother, three children), their addresses, and their telephone numbers. The report also contains the following:
"Victim Impact:
As indicated above the victim is deceased as a result of this offense. Comments from the victim's family are contained on PB Form 203-B which is part of the file. It should be noted, however, that following the trial in this case, I discussed this matter with the victim's family. All the persons present stated they were satisfied with the verdict of the jury and the recommendation of the jury."
PB Form 203-B is not attached to the presentence report and is not contained in the record on appeal. There is no indication that it was considered by the trial judge.
The holding of the Alabama Supreme Court in Ex parte Martin, 548 So.2d at 497-98, is equally applicable in this case:
"In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court held that the introduction at the sentencing phase of a capital murder trial in the state court of a victim impact statement, describing the effect of the crime on the victim's family, violates the Eighth Amendment. This case, however, differs from Booth.

"In Booth, the victim impact statement was submitted to the jury for its consideration. In the present case, the presentence report was not presented to the jury, but was presented to the court.

*527 We also note that the victim impact information comprises only three sentences in a 36-page report that contains, among other things, details of the offense, mitigating and aggravating circumstances, [the defendant's] criminal record, and [the defendant's] personal history. We hold that the introduction of the presentence report containing the above statement was not error."
Here, the presentence report containing the "victim impact statement" was considered only by the trial judge and not by the jury. The information contained in this statement is relatively innocuous in that it contains very little information about the victim's personal characteristics, the emotional impact of the crime on the victim's family, and the family members' opinions about the crime and the defendant. On these facts, we distinguish this case from Booth, supra, and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). Our finding of no error in the admission of the particular information concerning the victim and her family is confined to the facts of the case before us.

C.
The inclusion of the defendant's criminal history in the presentence investigation report was proper. Thompson, 503 So.2d at 880.

D.
The defendant contends that the trial judge should not have considered the presentence investigation report because it contains the parole officer's recommendation of punishment.
The presentence report concludes with the following paragraph:
"In considering matters of mitigation and extenuation the court is advised that in my opinion there are no mitigating circumstances to my knowledge which would apply. As the court is well aware there are numerous aggravating circumstances which were proven to the jury at the time they rendered their verdict and recommendation. It is, therefore, respectfully recommended that the jury recommendation of death be upheld."
Nowhere in the record does there appear any objection to this or any other portion of the presentence report. However, this court has neither found nor been cited to any authority for the parole officer's recommendation. Although we do not approve or condone such a recommendation, we find that even if such recommendation constitutes error, we would find that error harmless in this case. Rule 45, A.R.A.P. "[T]he mere presence of information in the pre-sentence report which should not be considered for the purpose of enhancing punishment is not, per se, prejudicial." Johnson v. State, 521 So.2d 1006, 1013 (Ala.Cr.App.1986), affirmed, 521 So.2d 1018 (Ala.), cert. denied, 488 U.S. 876, 109 S.Ct. 193, 102 L.Ed.2d 162 (1988).
The trial judge entered three orders summarizing the evidence and his findings: 1) "Finding of fact by the court from the evidence and testimony presented during the trial phase of the trial summarizing the crime and the defendant's actions therein," 2) "Finding of fact in regard to the punishment phase of the trial," and 3) "Consideration and findings of the court in determination of sentence." These three orders comply with ง 13A-5-47(d). Our review of these orders convinces this Court that the sentence of the trial judge was based upon his own determination of the existence of and his weighing of the aggravating and mitigating circumstances.
The trial judge found that "[n]othing contained in the Pre-Sentence Report would, in the opinion of the Court, constitute a mitigating circumstance as provided in either Section 13A-5-51 or 13A-5-52." In accordance with ง 13A-5-47(d), the trial judge entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in ง 13A-5-49. He found the existence of only one aggravating circumstance: "The capital offense was committed while the defendant was in the process of committing a robbery in the first degree." See ง 13A-5-49(4).
*528 The trial judge also entered specific written findings concerning the existence or nonexistence of each mitigating circumstance enumerated in ง 13A-5-51, and any additional mitigating circumstances offered pursuant to ง 13A-5-52. The trial judge found no mitigating circumstances. The trial judge specifically set out the evidence which the defendant had offered as nonstatutory mitigating circumstances, and, after doing so, concluded: "Nothing contained in the foregoing finding would, in the opinion of the Court constitute a mitigating circumstance as a basis for a sentence of Life Without Parole instead of death."
In his findings from the penalty phase of the trial, the trial judge concluded:
"The Court finds that the conduct of the Defendant, Kuenzel, constituted a brutal, aggravated, merciless, and intentional killing of a helpless female, Linda Offord, who was simply attending to her business at her place of employment while trying to make a living. The Court further finds that the recommendation of the jury as to the punishment to be imposed was fully justified by the facts and circumstances of the case, together with the process of weighing the aggravating and mitigating circumstances.
"The Court further finds that the sentence of Death was not recommended by the jury under [the] influence of passion, prejudice, or any arbitrary factor."
In his order on determination of sentence, the trial judge concluded:
"The Court having considered the aggravating circumstances, the Pre-Sentence Investigation Report, the absence of mitigating circumstances, the facts of the case in hand as brought forth by the testimony and by the exhibits in the case, and the jury's recommendation of a death sentence by a vote of 12-0, there is only one logical conclusion as to the Defendant's punishment, that conclusion being that he should suffer the punishment of death by electrocution as provided by law, and should be executed for the crime he has committed. So be it."
On this basis, we conclude that the recommendation of punishment by the parole officer was not an influencing factor in the trial judge's determination of sentence.

E.
The defendant argues that the presentence investigation report should not have been considered because it contained "inflammatory and inadmissible hearsay which deprived [the defendant] of a reliable determination of punishment." Appellant's brief at 101.
"Courts are permitted to consider hearsay testimony at sentencing.... While hearsay evidence may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability.... These protections apply not just to hearsay testimony but also to any information presented at sentencing.... When, as in this case, the defendant claims that his due process rights were violated by the sentencing court's reliance on materially false information, the defendant must establish not only that the disputed information is materially false or unreliable, but also that the sentencing judge relied on the information."
United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989). A sentencing judge may consider hearsay evidence so long as the defendant had a fair opportunity at rebuttal. Smiley v. State, 435 So.2d 202, 206 (Ala.Cr.App.1983); Johnson v. State, 399 So.2d 859, 864 (Ala.Cr.App.), affirmed in part, reversed in part on other grounds, 399 So.2d 873 (Ala.1979).
In Thompson, 503 So.2d at 880, this Court rejected the argument that the presentence report was inadmissible at the sentence hearing because, among other things, it "included hearsay ... [and] the summary of the crime was prejudicial":
"It is clear to this court that the report is entirely consistent with Alabama's capital murder statute regarding evidence to be considered in sentencing. Section 13A-5-45(d), Code states, `[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence *529 hearing regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.' Further, the report itself is an out-of-court statement and is entirely hearsay. However, it is admissible under ง 13A-5-47 Code of Alabama, being specifically called for consideration by the trial court.
"It is equally clear to this court that the summary of the offense contained in the pre-sentence report was not prejudicial to this appellant. He argues that this summary contained an opinion [by the parole officer] as to his culpability in the crime in question. This argument is without merit. The appellant's culpability was established by the jury's verdict of guilt. Further, the summary of the offense is consistent with the evidence presented by the State and with the appellant's own statement which was admitted into evidence at trial. The appellant was not prejudiced by this information."
Thompson, 503 So.2d at 880.
The exclusion of hearsay evidence that is highly relevant to a critical issue in the penalty phase of a trial may constitute reversible error. Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979).
1. In the "reputation and community attitude" portion of the presentence investigation report, the parole officer stated:
"My field investigation of this young man's background revealed no one who had anything of a positive nature to say about him. Officers involved in the investigation describe him as a `smart A' and I note that he was also described similarly in a Pre-Sentence Investigation, Youthful Offender, prepared by the Tallapoosa County Office. He is also described in that report as the type of young man who cannot be trusted to stay out of trouble. I note from the preliminary investigation report in this offense that he is described as being extremely cocky and arrogant when he was being questioned regarding this offense. That comment ... was made by an investigating officer who as I indicated previously was not complimentary about Kuenzel. In summary, I have received no comments from anyone since his trial and conviction recommending leniency for Defendant Kuenzel."
The defendant objects to the "undocumented assertions that `no one had anything of a positive nature to say about' [the defendant], that he was `cocky,' `arrogant,' and `could not be trusted.'" Appellant's brief at 101. However, these characterizations, for the most part, are supported by the testimony presented at trial and at the sentencing hearing.
There is evidence that the defendant escaped while awaiting trial. He has a significant history of relatively minor criminal offenses. A witness testified that the defendant described himself as "a capital asshole" who could kill someone and get away with it. In that same conversation, the defendant was quoted as saying, "I might get killed myself, but I know I wouldn't get caught." In talking about the murder, the defendant was said to have stated that "if you're going to do it, you shoot somebody ... with a shotgun, not a pistol or rifle, because they can trace a pistol or rifle," and, "They don't have a clue of who killed her and won't have." There is evidence that immediately after the murder, the defendant threatened Venn with a pistol. There is also evidence that the defendant and his mother attempted to bribe Goggins to perjure himself. At the hearing on the motion for new trial, the defendant, through his own testimony and the testimony of his father and mother, attempted to establish that he had spent the entire night with a female. In his order overruling the motion for new trial, the trial judge found "this to be completely false and a ... lie on the part of the defendant and other members of his family," and regarded "[t]his attempt to implicate this innocent and unsuspecting lady [who did not even know and had never been with the defendant] in the affairs of the defendant a disgrace." The trial judge *530 found that there was "no plausible nor truthful newly discovered evidence."
Furthermore, the trial judge observed the defendant throughout the trial and was in a position to characterize the defendant's demeanor and attitude.
2. The defendant also complains because the presentence report contains a list of his arrests. It is well settled that in imposing sentence a trial judge may consider evidence of criminal conduct not resulting in a conviction. Godfrey v. State, 383 So.2d 575, 578 (Ala.Cr.App.), cert. denied, 383 So.2d 579 (Ala.), cert. denied, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980). See also United States v. Peagler, 847 F.2d 756, 758 (11th Cir.1988) ("[A] sentencing court may consider in sentencing, uncounseled misdemeanor convictions where defendant was not imprisoned.").
"Arrests, juvenile dispositions short of an adjudication, and the like can be extremely misleading and damaging if presented to the court as part of a section of the report which deals with past convictions. If such items are included, a special effort should be made to assure that one using the report cannot possibly mistake an arrest for a conviction. Failure in this respect could leave the sentence imposed subject to attack, since it is violative of due process for the trial court to impose a sentence under the mistaken belief that the defendant was guilty of other crimes and the defendant was not represented by counsel. Towsend v. Burke, 334 U.S. 736, 741 [68 S.Ct. 1252, 1255, 92 L.Ed. 1690] (1948)."
Commentary to Rule 26.3, Alabama Rules of Criminal Procedure, adopted May 31, 1990, to be effective January 1, 1991. Here, the presentence report section entitled "prior arrest record" is divided into two subsections. The "juvenile" subsection reveals no record of prior juvenile offenses, although the defendant's mother had reported some "juvenile problems" with the police. The second subsection is "adult record." The disposition or status of each offense under this subsection is shown so that there is no confusion between arrests and convictions.
We find no cause for reversal because the trial judge considered the presentence investigation report.

XXVII.
The defendant argues that his death sentence cannot be upheld because it is disproportionate to the penalties imposed for similar crimes.
Pursuant to Rule 45A, A.R.A.P., this Court has searched the record for any plain error or defect. We have found no error or defect which either has or probably has adversely affected any substantial right of the defendant. Pursuant to ง 13A-5-53(a), we have found no error adversely affecting any right of the defendant at either the guilt or penalty phase of the proceedings. The trial judge's findings concerning the aggravating and mitigating circumstances are supported by the evidence, and death is the proper sentence.
Under ง 13A-5-53(b) and (c), this Court must determine that death is the proper sentence in this case. Our search of the record reveals no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. Like the trial judge, we are not impressed with the defendant's mitigating evidence that he was influenced by drugs and alcohol and that he was a loving father and son. Furthermore, we find that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. As was noted in Beck v. State, 396 So.2d 645, 654 n. 5 (Ala.1980), two-thirds of Alabama death sentences are for robbery-murder. Although we have reviewed "worse" crimes of robbery-murder, the apparent cold-blooded, senseless, and unmerciful manner in which the defendant executed this crime impresses this Court as it did the trial judge. Other than the general arguments for not imposing a punishment of death in any case, we find no reason to spare the defendant's life.
*531 The judgment of the circuit court convicting the defendant of the offense charged in the indictment and sentencing him to death is affirmed.
AFFIRMED.
All Judges concur.